**In re L. F., T. F., and W. F., Jr.**

**No. 9244.**

Court of Civil Appeals of Texas, Amarillo.

May 27, 1981.

White, Self & Davenport, Erwin Davenport, Plainview, for appellant.

Bob Bass, County Atty., Plainview, for appellee.

DODSON, Justice.

The Texas Department of Human Resources (the "Petitioner") instituted this action against the Natural Mother and the Natural Father to terminate their parental relationship with L.F., T.F., and W.T.F., Jr. After a bench trial on the merits, the court ordered judgment terminating the parental rights of each natural parent. The Natural Mother appeals from the judgment.[1] The court filed findings of fact and conclusions of law. On appeal, the Natural Mother attacks the legal and factual sufficiency of the evidence to support the court's findings and conclusions, and further maintains that she was denied due process of law as guaranteed by the United States Constitution. Concluding that the Natural Mother's contentions do not present cause for disturbing the judgment, we affirm.

As grounds for termination, the Petitioner alleged that the Natural Mother had violated section 15.02(1)(D) and section 15.-02(1)(E) of the Texas Family Code Annotated (Vernon 1975), and that termination is in the best interest of the children. The pertinent provisions of section 15.02 applicable to this action state:

A petition requesting termination of the parent-child relationship with respect to a parent who is not the petitioner may be granted if the court finds that:

(1) the parent has:

\* \* \* \* \* \*

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; *or*

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; ... *and in addition*, the court further finds that

(2) termination is in the best interest of the child (emphasis added).

For termination under these statutory provisions, the Petitioner must prove the requirements of subsection (D) or (E) and that termination is in the best interest of the children. In this connection, certain general principles apply to all parent-child termination proceedings. There is a strong presumption that the children's best interest is usually served by keeping them with their natural parents. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex.1976). Furthermore, the Texas Supreme Court has determined that in involuntary parent-child termination proceedings, the essential facts must be proved by "clear and convincing evidence." *In re G.M.*, 596 S.W.2d 846, 847 (Tex.1980). The "clear and convincing evidence" standard is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* at 847 (*quoting Texas v. Addington*, 588 S.W.2d 569, 570 (Tex.1979)).

In its findings of fact, the court found:

3. That [the Natural Mother] has knowingly and voluntarily placed and knowingly allowed the children to remain in conditions or surroundings which endanger the physical and emotional well-being of the children.

4. That [the Natural Mother] has engaged in conduct which endangers the physical and emotional well-being of the children.

---

1. The record shows that the Natural Father made a motion for a new trial which was granted. He is not a party to this appeal.

5. That despite repeated notice of the conditions which endangered the children, [the Natural Mother] disregarded the emotional and physical well-being of the children.

The court made the following conclusions of law:

1. The Court finds that termination of the parent-child relationship between [the Natural Mother] and the herein named children is in the best interest of the children.

2. The Court finds that [the Natural Mother] was capable of comprehending the parental responsibilities vested upon her, but that she knowingly and voluntarily elected to disregard those responsibilities to the detriment of the children and their welfare.

By her first ten points of error, the Natural Mother contends that the evidence is legally and factually insufficient to support the above-quoted findings of fact and conclusions of law. In deciding the legal insufficiency challenges, we must review the record to ascertain if there is any evidence of probative force to produce in the mind of the trier of the facts a firm belief or conviction that the challenged findings and conclusions are true. *See In re G.M.*, 596 S.W.2d at 847; *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

A Child Placement Worker with the Petitioner for six years first contacted the children on September 7, 1977. On that occasion she received an anonymous phone call stating that there were small children left alone in a trailer house. Upon investigation, she and a co-worker found the two oldest children, L.F. and T.F., alone in the trailer. At that time, L.F. was 18 months of age and T.F. was 4 months. The youngest girl, T.F., was lying on the floor. The oldest child, L.F., was found in a playpen in one of the bedrooms. Both children were wet.

The children were taken to the worker's office. She testified that the Natural Mother was very upset and demanded the children's return. The worker learned that the Natural Father was in jail in Plainview

and that the Natural Mother had been to the jail to visit him. The children were then placed in foster care. Plans were made with the Natural Mother to take the children to the doctor and they were placed back with her on October 7, 1977. The worker continued to assist the Natural Mother until the Natural Father returned to the home on December 5, 1977. The worker testified that during that time, she had trouble getting the Natural Mother to give L.F. vitamins and medication which had been prescribed by the doctor for anemia and an ear infection. The worker learned that the Natural Mother had no food and was behind on the rent, so she helped her fill out necessary forms for assistance. During this period of time, the worker testified that, in her opinion, the children were not receiving a balanced diet in that the Natural Mother would only feed the children milk. She distrusted solid baby food.

The worker was out of contact with the family most of the time between December, 1977, the date the Natural Father was released from jail, and June, 1978. In June, 1978, the Natural Mother contacted the worker and said that a warrant had been issued for the Natural Father's arrest and that he was no longer in the home. When the worker got to the home, there was no food nor money. The Natural Mother was taken to buy food and she was again re-certified for welfare assistance.

The worker testified that she detected no improvement in the condition of the home from December to June. She saw the Natural Father one time during that period and he stated that the children were doing fine. But for a brief furlough in October, 1979, the Natural Father has not been in the home since June, 1978.

The Natural Mother was about four months' pregnant in June when the worker re-established contact with the family. From June, 1978, until the children were placed in foster care in December, 1978, the worker testified that she worked very closely with her. She took her to the doctor,

helped her buy her groceries, worked with her on child care, and secured different resources, such as arranging for church workers to come to her home. According to the worker, the Natural Mother had a terrible case of roaches in her trailer, even in the refrigerator, and some volunteers sprayed for these.

The worker took the Natural Mother to the hospital to have the baby. The baby, W.F., Jr., was born on 17 November 1978. The worker bought some clothes to bring the baby home in. After the Natural Mother came home from the hospital, the worker visited in the home on several occasions. The baby would be very wet and would be on the couch, instead of the baby bed which had been supplied. The worker said that the baby looked poor and thin. The Natural Mother breast-fed the baby and stated to the worker that he slept with her and ate all night and was given water during the day. The baby weighed seven pounds, two ounces at birth and three weeks later, after a doctor's examination, weighed the same. However, the baby was not malnourished. The baby had a severe case of bleeding diaper rash. In addition, L.F., the oldest child, had been biting T.F., the middle child. The Natural Mother had tried to contact the worker in early December, but the worker had been out of town. When the worker returned on the 19th, she found that the Natural Mother had run out of food and money since her receipt of money and food stamps on the first of December, 1978. The Natural Mother told her that the children had not eaten in three days. The children were then placed in foster care and have been in foster care since that time. At that time, L.F. was two and one-half years old, T.F. was twenty-one months old, and W.F., Jr., was six weeks old.

The worker testified that the children, when removed, did not appear to be of normal development for their respective ages. L.F. was not talking and was not potty-trained. She further testified that the children were not being properly stimulated in the home. They watched television all the time and were not allowed to play with their toys. She concluded that this lack of stimulation hampered the children's mental and emotional development.

The worker testified that the Natural Mother still resides in the same two-bedroom mobile home and that she is a very neat housekeeper. She has a very difficult time managing or budgeting her limited financial assistance. The children were not physically abused at any time during the worker's supervisory period. The children were not malnourished, but received a poor diet. Their personal hygiene was not good. The worker testified that she believed that the Natural Mother could not adequately take care of her children. She stated that live-in help and constant supervision or coaxing would be required for the Natural Mother to properly exercise her parental duties. She concluded that the children's best interest would be served by terminating her parental rights with the children.

The examining psychiatrist is a medical doctor specializing in psychiatry, and is now medical director of the Central Plains MH/MR Center in Plainview, Texas. The Natural Mother was examined and tested by the psychiatrist and her staff in January, 1979. The psychiatrist testified that the Natural Mother had moderate mental retardation with an IQ score of 61. She also suffers from emotional disturbances, specifically, depressive reaction and schizoid personality, which stems from a difficult early life. The psychiatrist concluded that, at the time of the examination, the Natural Mother was not capable of taking adequate care of the children by herself. She testified that psychotherapy was not available because of the retardation and that her emotional disturbances caused her problems in relating to people. She further testified that she did not know of any resources to help the Natural Mother.

The psychiatrist also saw the two older children. She stated that L.F. was psychologically damaged when she saw her. Specifically, L.F. would respond to stressful stimuli by banging her head or rocking back and forth. The damage was due to cultural and nutritional deprivation. The psychia-

trist could not testify whether her psychological damage was permanent, but testified that the head banging and rocking indicated irreversible damage. T.F. did not exhibit any signs of psychological damage. Both girls were thinner than other children their age. The psychiatrist stated that the children should not be returned to the home unless the Natural Mother had a great deal of help and constant supervision.

The psychiatrist referred to the Natural Mother's problems as an emotional handicap over which she had no control. She further testified that the emotional and mental problems were the reason she had difficulty in taking care of the children. She opined that, with constant supervision and coaxing, the Natural Mother might be taught to properly care for the children over an extended period of time, but that she did not know of any resources for such. The psychiatrist said the Natural Mother was not capable of hurting or depriving or misusing the children of her own volition. Nevertheless, the psychiatrist concluded that the Natural Mother would never be a candidate for a full-time mother.

A volunteer also worked with the Natural Mother. She visited in the home frequently for about four months before the children were removed. She thought the standard of parental care was below average. The girls were usually in wet diapers, their clothes were dirty, and their hair was "netted." The baby was always wet and had diaper rash, would be cold in the winter, and would have sores on his face and body. The girls were allowed to jump and crawl over the baby on the floor. The Natural Mother had to heat the trailer by turning the oven on and opening the oven door. A window in the trailer was broken out and the volunteer's husband had to patch it with plywood. In the summer, the water cooler was open and the children could have gotten into the fan. The Natural Mother was cooperative when the volunteer was in the home, but she would not follow through with the parental skills taught by her. For example, the Natural Mother would not properly mix the baby formula after repeated instruction and demonstration by the volunteer.

The volunteer is providing foster care for T.F. and has since December of 1978. She testified that T.F. was behind in her mental and emotional development but has thrived since being in foster care. T.F. is now a happy, well-adjusted child. She is very bright and outgoing.

The Natural Father resides with the Texas Department of Corrections, serving a life sentence as a habitual offender. He was with the family from December of 1977, until June of 1978, when his parole was revoked for a second time. He testified that the children were well fed and well cared for when he was in the home. Neither he nor the Natural Mother ever harmed the children or physically abused them. He testified that they both helped with the household duties. No complaint was ever filed against them about neglecting the children during the period he was in the home. He further testified that he loved the children and wanted the opportunity to help appellant care for them. He testified that he would be eligible for parole in August, 1980, but that it would be his last chance to succeed as a parolee. He further testified that the Natural Mother had always been a loving mother to the children, and that together, they could care for the children adequately.

In essence, the Natural Mother says the evidence is legally and factually insufficient because the evidence shows that she is not capable of "knowingly" or "voluntarily" endangering the children due to her mental retardation and emotional disturbances. In support of her position she relies on *In re R____ E____ W____*, 545 S.W.2d 573 (Tex. Civ.App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.), where the court stated: "[T]he harsh and irrevocable remedy of termination is not justified where the evidence shows that a parent's failure to provide a desirable degree of care and support of the child is due solely to lack of intelligence, training, or misfortune."

In this instance, we do not agree that the Natural Mother's failure to provide a desir-

able degree of care and support is due solely to her lacking of training, intelligence, or misfortune. The evidence shows and fully supports the court's determination that she knowingly allowed the children to remain in conditions or surroundings which endangered the emotional well-being of the children and engaged in conduct which endangered their emotional well-being, and that termination is in the best interest of the children.

The department worker, the psychiatrist, and the volunteer worker all testified on behalf of the Petitioner. The Natural Father testified on his own behalf. The Natural Mother did not testify. We have considered the evidence under the appropriate legal standard and conclude that the evidence is legally sufficient to support the trial court's findings of fact and conclusions of law. Accordingly, the Natural Mother's legal insufficiency challenges are overruled.

In deciding the Natural Mother's factual insufficiency challenges, we must consider all of the evidence to ascertain if the evidence supporting the challenged findings and conclusions is too weak to produce in the mind of the trier of the facts a firm belief or conviction that the challenged findings and conclusions are true. *See In re G.M.*, 596 S.W.2d at 847, and *Garza v. Alviar*, 395 S.W.2d at 823. Having done so, we must conclude that the evidence is factually sufficient to support the challenged findings and conclusions. We therefore overrule the Natural Mother's factual insufficiency challenges.

In her eleventh and twelfth points of error, the Natural Mother contends that the trial court's termination of her parental rights violated the due process and equal protection requirements of the fourteenth amendment to the United States Constitution because the evidence is legally and factually insufficient to show that other alternatives, short of termination, were not available to adequately protect the children. She cites no authority for her asserted position. We agree that the right of a parent to conceive, bear and nurture children is one of constitutional dimensions. *Stanley v. Illinois*, 405 U.S. 645, 651–52, 92 S.Ct. 1208, 1212–1213, 31 L.Ed.2d 551 (1972); *In re G.M.*, 596 S.W.2d at 846; *Wiley v. Spratlan*, 543 S.W.2d at 352. However, we do not construe the due process and equal protection clauses of the fourteenth amendment to require the Petitioner to prove that no other alternatives, short of termination, are available.

Furthermore, section 15.02 of the Family Code sets forth the requirements for the involuntary termination. It does not require a showing that no other alternatives are available to protect the children. In general, this section has passed constitutional muster, *see D___ F___ v. Texas*, 525 S.W.2d 933, 941 (Tex.Civ.App.—Houston [1st Dist.] 1975, no writ), and the Natural Mother does not contend otherwise. Nor does she contend that she was denied notice and a hearing, or that the trial court lacked jurisdiction over the parties or the case. Accordingly, we overrule her eleventh and twelfth points of error.

In summary, we overrule the Natural Mother's twelve points of error, and we affirm the judgment of the trial court.