**Randy OLIVER, Sr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–99–00203–CR.**

Court of Appeals· of Texas,
San Antonio.

Sept. 27, 2000.

Rehearing Overruled Oct. 24, 2000.

Anne More Burnham, Van G. Hilley, Goldstein, Goldstein & Hilley, San Antonio, for Appellant.

Frank Follis, Asst. Dist. Atty., Seguin, for Appellee.

Sitting: CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice.

## OPINION

Opinion by: CATHERINE STONE, Justice.

Randy Oliver, Sr. appeals his conviction of two counts of aggravated sexual assault and one count of sexual performance by a child. A jury convicted Oliver and assessed punishment at fifty years imprisonment for each count of aggravated sexual assault and twenty years imprisonment for sexual performance by a child. For the following reasons, we affirm the trial court's judgment.

### FACTUAL & PROCEDURAL BACKGROUND

On December 3, 1997, appellant's son, Ryan Oliver, was arrested for possession of marijuana. At the time of the offense, Ryan was driving his father's truck. During an inventory search of Oliver's truck, the arresting officer discovered pornographic photos depicting Rose Oliver, his twelve-year old "sister"[1] in sexual positions with a man. All that is depicted of the man is his penis.

When initially questioned by investigators about the photographs, Rose stated that the pictures were of her and an "unknown male," approximately sixteen years old, whom she met while walking down the street from her house. The male, while driving a car, called out to her, "hey good looking." According to Rose, this pedestrian comment led to an invitation to have sex. Rose stated that she and the strang-

---

1. Rose is Randy Oliver, Sr.'s biological niece. She and her two sisters lived with appellant and his wife, Kathleen Oliver, and referred to them as "dad" and "mom."

er went to her house where they had sex and she posed for pictures. Rose signed a sworn statement to this effect. When further questioned by investigators, Rose modified her story, ultimately stating that Oliver was the man depicted in the photos. She also stated she and Oliver had sex after they took the photos. Rose signed a second sworn statement to this effect.

At trial, Rose explained that the pornographic photographs were taken over a weekend period while Oliver's wife was on a camping trip. Rose testified that she and Oliver had sex approximately six or seven times over a period of several months. Rose further testified that Oliver had begun fondling her at age nine.

Dr. Nancy Kellogg examined Rose in December 1997, two months after the weekend during which the photos were taken. During this examination, she noticed a "healed tear" in Rose's hymen, a wound consistent with vaginal penile penetration. Dr. Kellogg also found what she described as "suggestive" evidence of anal penetration.

### FANTASY/MANIPULATION TESTIMONY

■ In point of error number one, Oliver argues the trial court abused its discretion by allowing Sharon Willis, a psychotherapist at a therapeutic foster home agency, to testify that Rose's testimony was not the result of fantasy or manipulation. See *Schutz v. State*, 957 S.W.2d 52, 70 (Tex.Crim.App.1997) (holding that expert testimony that person's allegations are result of manipulation or fantasy constitutes impermissible comment on person's credibility). The State argues that Oliver has failed to preserve error on this issue because defense counsel failed to timely object to the testimony complained about on appeal. See TEX.R.APP. P. 33.1. In a post-submission brief, Oliver argues that, despite defense counsel's failure to object to the specific fantasy/manipulation evidence about which he now complains, counsel's initial objections to Willis' testimony sufficiently alerted the trial court to

the nature of his complaint, thereby preserving this issue for appellate review. The following excerpt provides a backdrop for Oliver's complaint:

**Prosecutor:** Now, there has been some evidence adduced that when first confronted with the pictures that were the start of this case. . . . [R]ose at first alleged that it was a stranger that was the male participant with her in the activities in the pictures and then gave a statement that said it was essentially a one time or one weekend event with this Defendant and then has gradually told of more events that have occurred the longer the case has gone on. Are you surprised by this? Is this unusual?

**Willis:** No, sir.

**Defense counsel:** I would object, Judge, before she answers, please. It is **irrelevant** to this case whether she is surprised . . . **I object.** Certainly if there is any relevancy to it, its probative value or possible probative value is outweighed by the prejudicial effect it would have on this jury . . .

**State:** I believe the law is clear that we are entitled to adduce from an expert, as Ms. Willis is, evidence regarding child sexual abuse syndrome and that is what I intend to do, Your Honor.

**Court:** You need to go ahead and develop that before you start asking questions concerning that syndrome.

**Prosecutor:** Let me ask you this, Ms. Willis, in another way. Have you previously in your practice or in the research or study that you have done that children are reluctant to tell the full extent of the abuse they have suffered?

**Willis:** Yes.

**Prosecutor:** Why is that?

**Willis:** Well, it is very frightening for them and, if they are dealing with—If they are talking about people that they have lived with, it is really eroding their whole sense of security.

**Defense counsel:** Judge, I want to make this clear. *I am objecting to this*

*line of testimony.* I think it is **irrelevant** to this case and I[sic] it is designed to prejudice the jury. Any probative value it would have would clearly be outweighed by its prejudicial effect and *I want to object to the entire line of testimony.*

\* \* \* \*

Court: The ruling is that the objection is overruled. Proceed.

Prosecutor: Is there a recognized condition called the child sexual abuse syndrome?

Willis: Yes, sir.

Prosecutor: What are some of the characteristics that you might see a child who has been sexually abused exhibit?

Willis: Very fearful; a sense of guilt; a sense of responsibility.

\* \* \* \*

Prosecutor: What other attributes would you expect to see in a child suffering from child sexual abuse syndrome?

Willis: Difficulty in trusting adults.

Prosecutor: Would a typical child suffering from child sexual abuse syndrome be forthcoming with the details of the abuse or would it be difficult for them to elaborate and tell what happened to them?

Willis: It would be very difficult because of their sense of guilt.

Prosecutor: Does Rose, to your understanding and interpretation, exhibit the characteristics of child sexual abuse syndrome?

Willis: Yes, sir.

Prosecutor: Now, in your treatment of Rose have you determined whether or not she suffers from any mental handicap or mental disorder or some other physical or mental impairment that would adversely affect her perception or memory?

Willis: No, sir.

\* \* \* \*

Prosecutor: *Does she exhibit any of the common symptoms or traits of a child who is fantasizing or being manipulated to give false testimony* ?

Willis: *No, sir.*

Prosecutor: What about Rose's sister, Tammy who was 11 years old when this case arose?

\* \* \* \*

■ Oliver's argument fails in the instant case because the testimony to which defense counsel objected was admissible expert testimony. While an expert may not testify that a person's recitation of events is or is not the product of fantasy or manipulation because such evidence is, in effect, particularized testimony concerning the person's credibility, *see Schutz,* 957 S.W.2d at 69, an expert may, nevertheless, testify about both the common traits/symptoms of child sexual abuse syndrome and whether the victim exhibits these traits. *See Vasquez v. State,* 975 S.W.2d 415, 416–17 (Tex.App.-Austin 1998, pet. ref'd) (citing *Yount v. State,* 872 S.W.2d 706, 709 (Tex. Crim.App.1993) and *Cohn v. State,* 849 S.W.2d 817, 819–21 (Tex.Crim.App.1993)). The record demonstrates that defense counsel initially objected to a question designed to elicit an explanation regarding the evolving nature of Rose's story. In response, the prosecutor explained he was attempting to develop evidence about the child sexual abuse syndrome which would then be applied to Rose. The trial court allowed the prosecutor to continue. Several questions later, defense counsel objected "to th[e] entire line of testimony." The record shows that the testimony to which defense counsel objected was admissible foundation evidence regarding child sexual abuse syndrome evidence. Later, when the prosecutor elicited the evidence concerning the truthfulness of Rose's testimony, defense counsel did not object. Based on this record we find that defense counsel's objections to admissible child sexual assault syndrome evidence failed to suffi-

ciently alert the trial court to nature of his complaint, and thus failed to preserve error regarding seemingly inadmissible credibility evidence. *See* Tex.R.App. P. 33.1.

Point of error number one is overruled.

### EVIDENCE OF PAST SEXUAL ABUSE

In points of error two, three, and four Oliver complains that trial court erred in excluding evidence regarding Rose's past sexual abuse, which was admissible under Rule of Evidence 412 to rebut or explain scientific or medical evidence offered by the State. Under these points, Oliver complains that (1) he was denied the right to cross-examine Ms. Willis about Rose's past sexual abuse; (2) he was denied the right to cross-examine Rose about her past sexual abuse; and (3) he was denied the right to cross-examine Dr. Kellogg about Rose's past history of sexual abuse. Oliver contends that the exclusion of this evidence prevented him from developing his defensive theory that someone other than him had sexually abused Rose. Oliver asserts that the evidence of Rose's prior abuse was relevant to fully explain Willis' testimony regarding the child sexual abuse syndrome. We take the complaints in the order presented.

■ We review a trial court's evidentiary rulings under an abuse of discretion standard. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). Under that standard, we will not disturb a trial court's decision unless it lies outside that zone within which reasonable persons might disagree. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App.1991).

### 1. Willis

■ As noted, on direct examination Willis offered general testimony about the child sexual abuse syndrome and stated that in her opinion Rose suffered from it. On cross-examination, defense counsel sought to question Willis about Rose's history of sexual abuse by persons other than Oliver. The State objected on the grounds of relevancy. Specifically, the prosecutor

argued that such evidence should not be introduced because there was "no showing that molestation at two or any age has anything to do with this case." The trial court did not allow the defense to pursue this line of questioning.

In a bill of exception, Willis specifically testified that she had no knowledge about Rose's past sexual abuse. Thus, even if evidence regarding Rose's prior sexual abuse was relevant, Willis had no knowledge regarding Rose's prior sexual abuse; therefore, on this record, it cannot be said that the trial court abused its discretion in not allowing defense counsel to cross-examine Willis about Rose's prior sexual history. *See* Tex.R. Evid. 602 (proffered witness must have personal knowledge of purported facts).

### 2. Rose

■ Oliver's argument concerning Rose fails for the same reason. In a bill of exception, the trial court allowed defense counsel the opportunity to elicit testimony from Rose regarding prior sexual abuse from family members other than Oliver. Rose testified that she did not remember being sexually assaulted by anyone other than Oliver. She testified that family members had told her she was abused, but she denied having any memory of it. Because Rose denied any personal knowledge of abuse and the only allegations of abuse about which she could testify constituted inadmissible hearsay, we find that the trial court did not abuse its discretion in not allowing defense counsel to question Rose about her alleged prior abuse. *See* Tex.R. Evid. 602 (proffered witness must have personal knowledge of purported facts); Tex.R. Evid. 802 (hearsay statements generally inadmissible).

### 3. Dr. Kellogg

■ As noted, on direct examination, Dr. Kellogg testified that she examined Rose in December 1997. During her examination, Dr. Kellogg noticed a "healed tear" in Rose's hymen, a wound which is

consistent with vaginal penile penetration. Dr. Kellogg also found what she described as "suggestive" evidence of anal penetration; she could not state with certainty whether the anus wound was caused by penile penetration.

The issue of Rose's sexual history was not explored during either Dr. Kellogg's direct or cross-examination. It is true that Dr. Kellogg's report indicated that Rose told her she had been sexually abused by her biological father. Defense counsel, however, never attempted to question Dr. Kellogg about Rose's sexual history. If a defendant never sought to introduce evidence at trial, it cannot be said that the trial court excluded it therefrom. *Fuller v. State,* 827 S.W.2d 919, 929 (Tex.Crim.App.1992), *cert. denied,* 509 U.S. 940, 114 S.Ct. 13, 125 L.Ed.2d 765 (1993). The complaint regarding the exclusion of Dr. Kellogg's testimony has not been preserved for review. *See id.*

Points of error two, three, and four are overruled.

### ARREST OF CHARACTER WITNESSES

■ In points of error five and six, Oliver contends that he was denied his Sixth Amendment right to compulsory process because the trial court permitted his bailiff to arrest material defense witnesses in front of the jury immediately after these witnesses testified favorably for him.

Randy Oliver, Jr., appellant's son, testified favorably for his father. Specifically, Randy stated that he loves his "sister," but in his opinion Rose has a reputation in the community as being untruthful. After he testified, Randy was escorted into the hallway by the trial court's bailiff, Jeff Gonzales, who placed Randy under arrest pursuant to a live warrant. Stella had an equally unpleasant experience after she testified favorably for appellant. Like Randy, Stella testified that Rose had a reputation in the community for dishonesty. Stella further testified that Rose originally told her that the man pictured in the incriminating photographs was not Oliver.

After testifying, Stella was arrested because she was a runaway.

■ The issue of the arrests of Randy and Stella was presented in Oliver's motion for new trial. Judge Peschel presided over both the trial and the hearing on the motion for new trial. We review the trial court's decision under an abuse of discretion standard. *Irizarry v. State,* 916 S.W.2d 612, 615 (Tex.App.-San Antonio 1996, pet. ref'd). An abuse of discretion is found when the trial court's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Id.* (citing *Cantu v. State,* 842 S.W.2d 667, 682 (Tex.Crim.App.1992), *cert. denied,* 509 U.S. 926, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993)). A trial court does not abuse its discretion in overruling a motion for new trial when presented with conflicting evidence. *Id.*

Acknowledging that Randy and Stella were arrested after they testified, the State argues that such arrests did not violate appellant's constitutional rights or discredit the witnesses' favorable testimony because the arrests occurred in the hallway, outside the presence of the jury. Oliver disputes this contention, insisting that the arrests occurred in the courtroom in front of the jury.

At the hearing on the motion for new trial, when asked where he was arrested, Randy stated:

> I was behind—in the door whenever they put the handcuffs on me and everything, but I was coming down from the witness stand and they called me over. [Gonzales] was pointing and he called me over there and I said, "Sir?" He pulled me over there and I said, "Well, what's—" You know, I kind of wanted to ask him what was going on.

> \* \* \* \*

> [When] I was coming off the witness stand I kind of caught a little movement off to the side when [the prosecutor]

said, "No further questions." So I was going to go out the door and [Gonzales] came walking over there and I just kind of caught his eye and he said, you know, "Come here, sir," and he motioned to me . . .

Q: Did you feel free to leave at that time?

A: Well, I wanted to leave but I had [Gonzales] tell me to, "Come here."

Q: So you felt like you were in his custody and you had to go with him?

A: Yes, ma'am, I felt like it.

On cross-examination, Randy admitted that he was not handcuffed or otherwise physically restrained in the courtroom in the presence of the jury. Randy agreed that inside the courtroom Gonzales merely gestured to him, directing him to exit the courtroom with Gonzales. Gonzales did not verbally instruct Randy. Josh Gideon, a friend of Randy's who was present during the trial, opined that the jury would have been able to view Randy's arrest in the hallway.

Stella stated that after she testified she was escorted out of the courtroom by Gonzales who was holding her hand behind her back. Gonzales did not say anything to her until they were in the hallway. Gideon recalled that while leading Stella out of the courtroom, Gonzales was removing his handcuffs from his belt.

In support of his motion, Oliver also attached an affidavit from James McKay, an investigator hired by the defense who interviewed jurors about the alleged arrest. McKay stated that he spoke with a Margaret Gregg who told him that she witnessed Randy "being arrested in the courtroom and led out in handcuffs." This statement seemingly conflicts with Randy's own testimony; he acknowledged that he was not physically restrained or handcuffed in the courtroom. McKay also stated that a Patricia Merritt told him "she heard [Randy] was arrested at the trial." McKay stated that Merritt said she wit-

nessed Stella being led out of the courtroom; she assumed Stella was being taken into custody. Finally, McKay stated that a third juror, A. Gene Dagel, told him that Oliver's "family had a lot of problems." Dagel recalled that Stella was taken into custody after she testified and that "[Randy] was arrested as well during the trial." The interviewed jurors did not indicate whether the arrests influenced their decision.

In general, Gonzales testified that neither Randy nor Stella was restrained, handcuffed, or otherwise taken into custody in the presence of the jury. He remembered motioning to both witnesses and leading them out of one of the two common doors of the courtroom. On cross-examination, Gonzales stated that he routinely leads witnesses to and away from the witness stand.

On conflicting evidence, the trial judge, who had personal knowledge of the events that transpired in his courtroom, concluded that the arrests did not occur in the courtroom and/or did not impact the jury's decision. The denial of the motion for new trial was thus within the trial court's discretion. *See Irizarry*, 916 S.W.2d at 615.

Points of error five and six are overruled.

The judgment of the trial court is affirmed.