

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00147-CV

IN THE INTEREST OF V.L.A. AND
E.M.C., CHILDREN

----------

## FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

V.A. ("Mother") appeals the trial court's order terminating her rights to her children, V.L.A. ("V") and E.M.C. ("E").[2] We affirm.

---

[1]See Tex. R. App. P. 47.4.

[2]We use aliases for the children and their relatives throughout this opinion. See Tex. R. App. P. 9.8(b)(2).

# I. BACKGROUND FACTS[3]

## A. MOTHER'S ACTIONS

Mother had two adult daughters, a teenage son ("A"), and three-year-old V when she began dating D.C. ("Dan") in 2009. Dan was twenty-one and Mother was about forty-one at the time. Mother and Dan began a romantic relationship, and Mother became pregnant with E in early 2010. E was born January 22, 2011.

Mother and Dan's relationship was volatile. Mother stabbed Dan in the hand with a fork after Dan failed to pay the electric bill. Another fight led to Mother accusing Dan of choking her, but it was later determined that Mother had scratched herself and Dan. This incident led to Mother pleading guilty to assaulting Dan. Mother admitted she has a bad temper. However, Mother and Dan continued to live together, and Dan would watch V and E while Mother cleaned houses.

Dan moved out of the three-bedroom apartment he shared with Mother, A, V, and E in July 2011. Shortly thereafter, V.C. ("Victor"), a friend of A's, moved in. Victor, who was eighteen, was a known drug user with an extensive criminal record. Victor introduced Mother to Buddah, and Mother began dealing methamphetamine for Buddah to make extra money. Mother knew selling

---

[3]As required for a legal- and factual-sufficiency review, this evidence is recited in the light most favorable to the judgment, with due deference conferred on the facts as necessarily found by the fact-finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

methamphetamine was dangerous and, specifically, that it would endanger V and E. However, she stored her methamphetamine in the bedroom she shared with V and E. She also allowed methamphetamine to be smoked in her home while V and E were present. Indeed, she admitted that she placed her children in harmful situations. Dan was afraid of Victor and was fearful of the situation V and E were living in with Mother and Victor. Mother considered Victor to be part of her family.

In August 2011, V told Mother that her babysitter had abused her physically and sexually. Mother suspected that the babysitter had sexually abused E as well. Mother called the police. During the ensuing investigation, Mother was not cooperative, was belligerent, and broke several therapy appointments for V. Although Mother stated V had cigarette burns on her back, V's physical exam showed no evidence to corroborate the abuse allegations. In short, Mother's story about the extent of V's abuse changed dramatically as time went by. The babysitter vehemently denied abusing V or E. The investigating police officer, Detective David Bearden, suspected Mother was dealing drugs; indeed, Mother told Bearden about her previous conviction for possession of 2,000 pounds of marijuana and seemed proud of it.[4] Bearden had "issues with some of the things" that Mother said V told her about the abuse because V was

---

[4]Mother admitted at trial that she had been convicted of transporting eighty-nine pounds of marijuana in 1998 and that her two older daughters and A were living with her at the time. The daughters went to live with their father after this, and Mother does not have a close relationship with them.

3

not verbal enough to "have put that together to tell [Mother]." Bearden closed the investigation for lack of evidence.

## B. MOTHER'S ARREST

On November 4, 2011, police officers executed a search warrant at Mother's home. The search warrant was obtained after a confidential informant twice bought drugs from Mother and after drug-selling activities were seen occurring at Mother's home. At the time the search warrant was executed, Dan was sleeping on the couch, Mother was in her bedroom with V and E, A was in his bedroom, and Victor was in his room with two friends. Mother led the officers to a stash of 5.8 grams of methamphetamine in her purse on the floor of the bedroom. She also had a marijuana pipe and small electronic scales in her bedroom. In Victor's room, officers found a methamphetamine pipe containing methamphetamine residue, a marijuana pipe, syringes, and a hookah. They arrested Mother and Victor for possession of a controlled substance; Mother and Dan later were charged with child endangerment. Mother was convicted of possession of a controlled substance and sentenced to two years' confinement. She was also convicted of two counts of endangering a child and received two concurrent 250-day sentences.

## C. PROCEDURAL FACTS LEADING TO TRIAL

The Texas Department of Family and Protective Services ("DFPS") filed a suit to terminate Mother's, Dan's, and V's father's parental rights to V and E on November 7, 2011. DFPS sought termination "if the children cannot safely be

4

reunified with either parent." In Mother's family-service plan, DFPS listed family reunification as the stated goal. *See* Tex. Fam. Code Ann. § 263.102(a)(5) (West 2008), § 263.103 (West Supp. 2012). But DFPS warned Mother that if reunification "cannot be done, DFPS also has a backup plan called the Concurrent Goal, . . . [which] DFPS works on . . . at the same time as the Permanency Goal." Further, DFPS gave Mother numerous behavioral changes and tasks to complete to reduce the risks to V and E. *See id.* § 263.102(a)(7)–(8). Mother acknowledged that if she failed to "provide [her] child(ren) with a safe environment, [her] parental and custodial rights [could] be restricted or terminated or [her] child(ren) [might] not be returned to [her]." *See generally id.* § 263.102 (mandating contents of service plan).

On November 18, 2011, the trial court held a hearing and issued a temporary order appointing DFPS temporary managing conservator of V and E. *See id.* § 262.201 (West Supp. 2012). The order warned Mother that if she failed to comply, her failure "may result in the restriction or termination of parental rights." *See id.* § 262.201(c). On March 27, 2012, DFPS filed a progress report regarding the family-service plan with the trial court and stated that the permanency goal continued to be family reunification. *See id.* § 263.303 (West Supp. 2012). On April 5, 2012, the trial court entered an order after a permanency hearing that continued DFPS's temporary managing conservatorship and noted that Mother "has not demonstrated adequate and appropriate compliance with the service plan as she is incarcerated." *See id.* §

5

263.306 (West Supp. 2012). The order again warned Mother that her parental rights could be terminated if she did not comply with the family-service plan. A similar order was entered on June 28, 2012, after a hearing on DFPS's progress report.

DFPS's goal eventually changed from reunification to termination based on "the [lack of] progress the parents have made throughout the case." Indeed, when DFPS filed its progress report on September 11, 2012, it stated that the permanency goal was termination. Likewise, V and E's guardian ad litem ("the GAL") recommended in her report filed before the permanency hearing that Mother's parental rights be terminated. Mother knew that the goal had been changed. The trial court entered an order on September 20, 2012, continuing DFPS's conservatorship and noting Mother was incarcerated and noncompliant with the family-service plan.

Mother was released on parole in October 2012. While she was incarcerated, Mother completed educational programs regarding addiction, parenting, anger management, and alcoholism. On October 30, 2012, DFPS filed a progress report again stating termination was the primary goal. On November 8, 2012, the court entered a fourth permanency order, finding Mother "has not demonstrated adequate and appropriate compliance with the service plan. She was recently released from incarceration and completed some self-help packets while incarcerated."

6

On December 12, 2012, Mother had a psychological evaluation as required by the family-service plan, which was administered by Mark Foster. During the evaluation, Mother downplayed her responsibility for her actions and did not express regret about selling methamphetamine. She was unable to put her children's needs above her own and could not recognize the danger of drugs or the need to stop using or dealing drugs. During subsequent group therapy, which also was required by the family-service plan, Mother flirted with the therapist, Mark Ditloff, because "she only knows how to relate [to Ditloff] through sex." Ditloff testified that Mother participated in group sessions and seemed to be improving.

On January 25, 2013, the trial court's fifth permanency order, based on DFPS's progress report listing termination as the primary goal, stated that Mother "is participating in services, but has not demonstrated adequate and appropriate compliance with the service plan. She completed some self-help packets prior to her release on August 28, 2012,[5] while incarcerated." The trial court entered a similar permanency-hearing order on March 7, 2013, and set DFPS's petition for trial on April 1, 2013. *See id.* § 263.306(a)(11). Mother filed a counterpetition seeking sole managing conservatorship of V and E. On March 21, 2013, V and E's GAL recommended that DFPS be appointed permanent managing

---

[5]This date appears to be incorrect because, other than this reference in the permanency order, the record shows Mother was released in October 2012. This error is not relevant to the disposition of Mother's appellate issues.

conservator, stated that V's and E's needs were being met while in the custody of DFPS, and explained that Mother had been noncompliant. Specifically since her release, Mother (1) only attended two individual counseling sessions with Ditloff in approximately four months when she was required to attend once every week, (2) had been untruthful during her required drug-and-alcohol assessment about her past drug use; (3) failed to participate in drug-education classes; and (4) failed to establish and maintain stable and appropriate housing.

### D. CARE OF CHILDREN WHILE IN CUSTODY OF DFPS

After Mother's arrest, A began living with his father. V and E were placed in foster care and both tested positive for drugs. Indeed, children can absorb methamphetamine through their skin or by inhaling if it is being smoked in their presence. During their time in foster care, V and E were in three inadequate foster homes—one of which was an unsuitable family placement—before they were finally placed in their current foster home where they are well cared for and happy.

V, who was five at the time of Mother's arrest, had "boundary issues" and was overly "open to strangers," which indicated she was "seeking love . . . from someone." While V was in foster care, she "played with herself regularly" and attempted to have sex with other children "because that's the way you show love." V indicated that "the way she felt close to her mother was when she masturbated." V's sexual acting out decreased and eventually stopped while she was in foster care. Although V was diagnosed with attention deficit disorder, any

8

concern about this condition waned as she continued in foster care.  V had phonological disorder, which is an inability to "use any and all syllables," that resolved while she was in foster care and began attending kindergarten.

E, who was eight months' old at the time of Mother's arrest, was severely underweight and developmentally delayed when he entered foster care.  He had digestive issues, frequent urinary tract infections, "weak social interaction," and needed occupational and physical therapy.  These issues were addressed while E was in foster care.  He, like V, improved while in foster care, and both were happy at their current foster home.

### E. THE TRIAL

The evidence at trial showed that DFPS concluded termination was in V's and E's best interest because "[Mother] is still associating with, engaging with, people involved in criminal activity and just concerns about her being honest and open."  Specifically, Mother still had contact with Victor, going so far as to bail him out of jail, and told her cell mate that she was planning to marry a convicted felon, Josh Harrison.[6]  DFPS attempted to arrange for family members to care for V and E, but these efforts were ultimately unsuccessful.  DFPS also concluded that Mother failed to properly supervise her children:  "She exposed them to picking up an illegal substance, transporting it to her house, cutting the - -

---

[6]Mother testified that she was not romantically involved with Harrison, but admitted she posted on her Facebook page "[Mother] love Josh" because she "love[s] him like my son."

9

packaging the drugs in her house to the point that it exposed her children, and allowing other members or other people [to] enter her residence to smoke methamphetamines with her children in the residence." At trial, the GAL concluded that they would be at risk of abuse or neglect if they were returned to Mother: "[Mother is not] able to take responsibility for her past actions, how those actions have affected the children, and make really significant life changes to be able to keep these children safe in the future."

At trial, DFPS sought termination solely based on sections 161.001(1)(D) and 161.001(1)(E) and abandoned the other grounds raised in its petition. Thus, DFPS argued that Mother's parental rights should be terminated because she "knowingly placed or knowingly allowed [V and E] to remain in conditions or surroundings which endanger the physical or emotional well-being of [V and E]" or "engaged in conduct or knowingly placed [V and E] with persons who engaged in conduct which endangers the physical or emotional well-being of [V and E]." Tex. Fam. Code Ann. § 161.001(1)(D), (E) (West Supp. 2012).

Mother testified at trial that she was willing to change because her children are her "whole life." She admitted she posted a picture of V on her Facebook page, saying V was "sexy," which she believed was an appropriate way to describe V. Indeed, Mother's Facebook page included many pictures of Mother in salacious poses and a picture of Harrison smoking a hookah. She also stated that because her only day off from work was Wednesday, her brother's ex-wife would move from Kansas to care for V and E. The house Mother was living in at

10

the time of trial and where she intended V and E to live with her was in a state of severe disrepair and it appeared a man was living there with Mother. Mother testified the man was moving out and that she was working to improve the home. However, Mother avoided all attempts V and E's attorney ad litem made to check on the state of the house.

Dan participated at trial, but voluntarily relinquished his parental rights because he wanted "the best" for E and because he could not appropriately parent E. *See* Tex. Fam. Code Ann. § 161.103 (West 2008). Dan admitted Mother loved her children but believed Mother sometimes put her interest in selling drugs above her children's best interest. V's father's parental rights were terminated by default.

The jury unanimously found that Mother had knowingly placed or knowingly allowed V and E to remain in dangerous conditions or surroundings and that she engaged in conduct or knowingly placed V and E with persons who engaged in dangerous conduct. The jury also found that termination of Mother's parental rights was in V's and E's best interest. The trial court entered a final order of termination terminating Mother's parental rights to V and E:

> Based upon the jury's verdict and the evidence submitted at trial, the Court finds by clear and convincing evidence that termination of the parent-child relationship between [Mother] and [V] and [E], the children the subject of this suit, is in the children's best interest.

The Court finds by clear and convincing evidence that [Mother] has:

11

knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children; and

engaged in conduct, or knowingly placed the children with persons who engaged in conduct, which endangered the physical or emotional well-being of the children.

*See* Tex. Fam. Code Ann. § 161.206 (West 2008). The trial court also terminated Dan's and V's father's parental rights and appointed DFPS as V and E's managing conservator. *See id.* §§ 161.001(1)(N), 161.204, 161.207.

Mother filed a motion for new trial, arguing that the evidence was legally and factually insufficient to support the finding that termination of her parental rights was in V's and E's best interest. The trial court denied the motion. Mother then filed a timely accelerated appeal arguing that her due-process rights were violated and that the trial court erred by admitting Foster's expert testimony. *See* Tex. R. App. P. 26.1(b), 28.4(a)(1). Neither Dan nor V's father appeal the termination of their parental rights.

## II. LEGAL CONSIDERATIONS IN PARENTAL-TERMINATION CASES

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child

12

not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Therefore, we strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied). Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also id.* § 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard

13

because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

### III. DISCUSSION

#### A. SUFFICIENCY OF THE EVIDENCE

#### 1. Standards of Review

In evaluating the evidence for legal sufficiency in parental-termination cases, we determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven. *J.P.B.*, 180 S.W.3d at 573. We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable fact-finder could have done so. *Id.* We disregard all evidence that a reasonable fact-finder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable fact-finder could, and we disregard contrary evidence unless a reasonable fact-finder could not. *Id.* We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the fact-finder's province. *Id.* And even when credibility issues appear in the appellate record, we defer to the fact-finder's determinations as long as they are not unreasonable. *Id.*

14

In reviewing the evidence for factual sufficiency, we give due deference to the fact-findings and do not supplant the fact-finder's verdict with our own. *H.R.M.*, 209 S.W.3d at 108. We determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the children. Tex. Fam. Code Ann. § 161.001(2); *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### 2. Change from Reunification to Termination

In her first issue, Mother argues that her due-process rights were violated by DFPS's arbitrary decision to seek termination instead of reunification after the family-service plan was in place. Mother admits that her behavior around V and E was "not a pretty picture" before her arrest on November 4, 2011; but she asserts that DFPS's goal was reunification even when faced with Mother's pre-arrest behavior. Mother points to the fact that when the goal was changed to termination—September 2012—she was still incarcerated, had completed many behavior-modification programs in jail, and repeatedly contacted DFPS to check on V and E; therefore, the evidence present at the time of the family-service plan seeking reunification was the same evidence present when DFPS changed its goal to termination. In sum, Mother argues that DFPS had insufficient evidence

15

of a detrimental change in circumstances from the time it set reunification as the permanency goal sufficient to support DFPS's later decision to seek termination. The tenor of Mother's appellate argument shows that she is arguing there was insufficient evidence to support DFPS's decision to change its permanency goal, which necessarily encompasses her due-process argument. [7] *See generally In re S.N.*, 272 S.W.3d 45, 61 (Tex. App.—Waco 2008, no pet.) (op. on reh'g) (recognizing all sufficiency points should be addressed "as a matter of due process"); *Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 678 (Tex. App.—Austin 2005, no pet.) (stating requirement of clear-and-convincing evidence "appropriate because termination is a drastic remedy of such weight and gravity that due process requires the [S]tate to justify termination of the parent-child relationship by more substantial proof than a preponderance of the evidence"). Thus, we address Mother's first issue as a sufficiency point.

Although the right to parent is one of constitutional dimension, DFPS is not required to show that other alternatives, short of termination, were not available

---

[7]DFPS asserts that Mother failed to preserve this issue for our review. Under the facts of this case, we believe Mother's motion for new trial, raising the claim that the evidence was insufficient to support termination, adequately raised her claim in the trial court that the evidence was insufficient to support DFPS's decision to proceed to termination, rendering the termination a violation of her due-process rights. *See* Tex. R. Civ. P. 324(b); *Arkoma Basin Exploration Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 387–88 (Tex. 2008) (holding post-trial, no-evidence motion challenging single jury issue sufficient to preserve error even if it fails to specify every reason the evidence is insufficient).

16

to protect the children. *In re L.F.,* 617 S.W.2d 335, 340 (Tex. App.—Amarillo 1981, no writ). At the time DFPS changed its primary goal to termination, the GAL also recommended termination. The GAL visited Mother in jail. During these visits, Mother "always seemed to place her needs over her children. She deflected her circumstances . . . onto other people to reflect the bad things they were doing, to not take accountability for her own actions." Mother did not ask about V and E, but wanted to talk about "how [Mother] was treated as a child and how she got into the situation she was in." Mother further told the GAL that she was forced to sell drugs because she could not take care of V and E financially although she had a job. When Mother was in jail, she had $2,700 in her inmate account, which was money she had "earned" and which Mother admitted meant she was not "broke." The GAL also testified that Mother lied to her repeatedly. The GAL believed termination was appropriate because "[o]ver the course of this . . . case, [the GAL] just doesn't see the progress, [Mother] being able to take responsibility for her past actions, how those actions have affected the children, and make really significant life changes to be able to keep these children safe in the future."

The DFPS case worker assigned to V and E's case ("the case worker") testified that Mother's behavior had not changed substantially since V and E were removed from her care. The GAL's and the case worker's observations of Mother's behavior after her arrest and before DFPS changed its permanency goal were sufficient to support its decision. *Cf. In re A.P.,* 184 S.W.3d 410, 416

17

(Tex. App.—Dallas 2006, no pet.) (questioning "lack of evidence regarding the abrupt change from a goal of reunification to termination shortly before the trial in this matter," but emphasizing court's role is to determine "whether all the evidence, both in support of and contrary to the trial court's finding, is such that the trial court could reasonably form a firm belief or conviction about the truth of the State's [termination] allegations").

### 3. Best Interest

To the extent Mother's claim could be construed as an argument that the evidence was insufficient to support termination based on V's and E's best interest, we conclude the evidence was sufficient.[8]  *See id.* at 415–16 (recognizing ultimate question for appellate court is evidence sufficiency to support termination, not sufficiency to support change in permanency goal).

There is a strong presumption that keeping a child with a parent is in the child's best interest.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.  Tex. Fam. Code Ann. § 263.307(a) (West 2008).  The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

---

[8]Mother seems to concede that, before she was arrested, she knowingly placed or knowingly allowed V and E to remain in dangerous conditions or surroundings and that she engaged in conduct or knowingly placed V and E with persons who engaged in dangerous conduct. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E).

18

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

    (A) minimally adequate health and nutritional care;

    (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116. Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted). These factors are not exhaustive; some listed factors may be inapplicable to some cases, while other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, the *Holley* factors focus on the best interest of the children and not the best interest of the parent. *See A.P.*, 184 S.W.3d at 415.

The evidence at trial showed that Mother chose her relationships with known drug offenders over her children. She continued to nurture those relationships even after being released from jail even though the family-service plan directed her to "alter behaviors that expose [V] and [E] to risk of harm," "to protect [V] and [E] from people who may inflict serious harm," and to "build a support network that will help ensure the safety of [V] and [E]." She even went so far as to pay $1,000 to bail Victor out of jail a few months before the termination trial and while she was still under an obligation to make monthly payments for V's and E's support. At trial, extensive evidence was introduced showing the great emotional, physical, and developmental strides V and E made once they were placed in an appropriate foster home. V stated that she wanted to live with Mother, but also wanted to stay with her current foster parents. Both V and E are happy at their current foster home. Mother's psychiatric evaluation revealed that she was antisocial, was not remorseful about her past involvement with drugs, and did not think "hanging out with people that have criminal backgrounds or that engage in criminal activities" was wrong. Mother was

21

unable to put her children's needs above her own and did not believe selling drugs was dangerous. Mother did not have a suitable home for V and E at the time of trial.

Considering the relevant statutory and *Holley* factors, we hold that, in light of the entire record, and giving due consideration to evidence that the fact-finder reasonably could have found to be clear and convincing, the fact-finder reasonably could have formed a firm belief or conviction that termination of Mother's parental rights to the children was in the children's best interest. *See In re J.L.B.*, 349 S.W.3d 836, 849 (Tex. App.—Texarkana 2011, no pet.) (noting that the parents' "poor judgment [and] the constancy of their drug use" weighed in favor of terminating their parental rights); *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) (holding that evidence of a parent's failure to comply with her family-service plan supports a finding that termination is in the best interest of the child); *Smith*, 160 S.W.3d at 681 ("[I]n considering the best interest of the child, evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past."). We overrule issue one.

### B. ADMISSION OF EVIDENCE

### 1. Error

In her second issue, Mother asserts that the trial court erred by allowing Foster to testify that Mother was not credible. At trial, Foster testified that Mother could not be believed:

22

Q  Did [Mother] ever acknowledge, when you were with her, the level of danger that it put her children in to be selling methamphetamines out of her apartment?

A  No.

Q  Did she ever even make a statement that she'd never do it again?

A  No.

Q  If she did, if she said that today -- once again, you did your evaluation in December -- if today she said, oh, I'll never do that again, how much confidence can we put into that?

[Mother's counsel]:  Objection, calls for speculation, lack of foundation.

THE COURT:  Overruled.

A  Based on her personality type and her history, I wouldn't see any reason to believe -- to have any confidence in it at all.

Mother asserts that this testimony was impermissible because it was an expert opinion regarding Mother's truthfulness.

DFPS argues that Mother has failed to preserve error on this issue because her trial objection does not comport with her complaint on appeal. Indeed, Mother objected to Foster's disputed truthfulness testimony at trial on the basis of improper speculation and lack of foundation.  On appeal, Mother now asserts that Foster's testimony regarding the amount of confidence that could be placed in her trial testimony was a direct opinion on her truthfulness and was inadmissible under Rule 702.  Tex. R. Evid. 702.  The trial court was not given the opportunity, in the first instance, to address Mother's argument attacking

23

Foster's expert opinion; therefore, Mother failed to preserve this possible error for our review. *See* Tex. R. App. P. 33.1(a)(1); *Diaz-Gomez v. State*, No. 05-09-01371-CR, 2011 WL 2279185, at *2 (Tex. App.—Dallas June 10, 2011, pet. ref'd) (mem. op., not designated for publication) (holding lack-of-foundation objection to expert's truthfulness testimony does not preserve appellate argument that expert may not testify as to other witness's truthfulness); *Oliver v. State*, 32 S.W.3d 300, 303–04 (Tex. App.—San Antonio 2000, pet. ref'd) (holding to preserve error, complaint regarding expert's testimony about credibility of witness must be subject of trial objection). *See generally In re B.L.D.*, 113 S.W.3d 340, 349–50 (Tex. 2003) (holding preservation requirements apply in termination cases), *cert. denied*, 541 U.S. 945 (2004). We overrule issue two.

## 2. Alternative Harm Analysis

Even if Mother preserved this issue for our review, she cannot show the required harm arising from the alleged trial-court error. To obtain reversal of a judgment based upon an error in the trial court, Mother must show that the error occurred and that it probably caused rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court. *See* Tex. R. App. P. 44.1(a); *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005). We will not reverse a trial court's judgment because of an erroneous evidentiary ruling unless the ruling probably caused the rendition of an improper judgment. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012). Normally, this would require a showing that the whole case turned on the

24

evidence at issue. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001) (op. on reh'g).

The evidence admitted at trial, which we recite above, reveals that Mother admittedly placed or allowed her children in dangerous situations and that termination was in the best interest of V and E. Further, the case worker testified that Mother repeatedly lied to her during DFPS's investigation. During Mother's testimony, she admitted that she continued to have contact with known felons, but she stated she would stop if V and E were returned to her, even though she did not think about severing those relationships after V and E were removed. DFPS did not stress Foster's testimony in closing arguments, other than obliquely referring to the fact that Mother failed to change and continued the same manipulative behavior that led to DFPS's termination suit. We conclude that even if admission of Foster's challenged testimony was erroneous, Mother has failed to show harm from the error.

## IV. CONCLUSION

Having overruled Mother's two issues, we affirm the trial court's judgment.

LEE GABRIEL
JUSTICE

PANEL: DAUPHINOT, GARDNER, and GABRIEL, JJ.

DAUPHINOT, J., concurs without opinion.

DELIVERED: September 26, 2013

25