# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**



### NO. 02-13-00345-CV

IN THE INTEREST OF N.A., MINOR
CHILD

### NO. 02-13-00346-CV

IN THE INTEREST OF M.A. AND
A.A., THE CHILDREN

----------

FROM THE 211TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant A.E. (Anjelica) appeals the trial court's order terminating her parental rights to her children, M.A. (Margaret) and A.A. (Allison). Appellant C.M. (Courtney) appeals the trial court's order terminating her parental rights to her child, N.A. (Natasha). Appellant N.A. (Nigel) appeals the trial court's order

---

[1]*See* Tex. R. App. P. 47.4.

terminating his parental rights to his children, Margaret, Allison, and Natasha. We affirm the trial court's order in the appeal No. 02-13-00345-CV terminating Courtney's and Nigel's parental rights to Natasha. We abate the appeal in No. 02-13-00346-CV and remand the case to the trial court so that it may properly notify the necessary Indian tribe and so that, after such notice, it may conduct a hearing and make a determination as to whether Margaret and Allison are Indian children under the Indian Child Welfare Act (ICWA).

## Background Facts

Courtney and Nigel began dating when Courtney was eighteen years old. Nigel is seven years older than Courtney. When their relationship started, Courtney did not know that Nigel was also dating Anjelica.[2] Courtney and Anjelica became pregnant by Nigel around the same time. Courtney and Nigel stopped seeing each other, and Anjelica moved in with Nigel.

Anjelica, Nigel, and the three children in this case lived with Nigel's mother, F.C. (Florence); his sister, C.A. (Connie); and Connie's three children. In March 2012, the Carrollton Police Department received information that Nigel was selling drugs out of Florence's house. Detective Joseph Fisher testified that more than one confidential informant had alerted him to Nigel's activities. Detective Fisher also received citizen complaints regarding Nigel. Based on this

---

[2]Anjelica divorced her former husband in 2010. Anjelica has three children from her previous marriage. Anjelica and Nigel also have a five-year-old son, J.A. (Johnny). Their rights to Johnny were terminated in 2009.

and other information, Detective Fisher executed a search warrant on Nigel's house in September 2012.

Detective Fisher found marijuana in a wallet with Anjelica's ID. He also found a basket in a cabinet with a pipe and baggie containing marijuana residue. Anjelica's, Margaret's, and Allison's Social Security cards were in the same cabinet. Detective Fisher found cocaine "in close proximity" to paperwork belonging to Nigel. The cocaine was on a mirror on a dresser in Nigel and Anjelica's room, within reach of the children. Detective Fisher also found cocaine residue in a closet that also contained a metal tray that he believed to be part of a digital scale and drug paraphernalia and Nigel's driver's license. Nigel was arrested for possession of a controlled substance, less than a gram, in a drug-free zone.[3] Anjelica was arrested for possession of marijuana. The Department of Family and Protective Services (DFPS or the Department) was notified, and it removed the children from the home.

When DFPS removed the children from Nigel and Anjelica's home, it could not locate Courtney. DFPS investigator Natalie Taylor testified that she tried getting Courtney's contact information from Anjelica, but Anjelica disliked Courtney so much that she refused to talk about her. Nigel identified some houses where Courtney might be found, but Taylor did not find her at the houses. Taylor contacted Courtney's mother, H.M. (Henrietta), but she was unable to

---

[3]Florence's house was within a thousand feet of an elementary school.

3

provide a phone number for Courtney because she had not had any contact with Courtney "for a while."

Nigel's mother Florence was not willing to keep the children and brought Margaret and Allison to the DFPS office. Allison was "screeching crying like she was in pain," which made Taylor concerned that Allison was suffering withdrawal symptoms. All three children were placed in foster care.

DFPS's investigation of Nigel and Anjelica was ruled reason to believe for neglectful supervision and physical abuse. DFPS's investigation of Courtney was ruled reason to believe for neglectful supervision. The Department filed its petition for termination of the parents' parental rights in September 2012.

A jury found that Courtney had knowingly placed or had knowingly allowed Natasha to remain in conditions or surroundings that endangered her physical or emotional wellbeing; that she had engaged in conduct or had knowingly placed Natasha with persons who engaged in conduct that endangered her physical or emotional wellbeing; that she had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain Natasha's return; that she had constructively abandoned Natasha; and that termination of her parental rights to Natasha was in Natasha's best interest. The jury found that Anjelica had knowingly placed or had knowingly allowed Margaret and Allison to remain in conditions or surroundings which endangered their physical or emotional wellbeing; that she had engaged in conduct or had knowingly placed the children with persons who engaged in conduct that

4

endangered their physical or emotional wellbeing; that she had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain Margaret's and Allison's return; and that termination of her parental rights to Margaret and Allison was in their best interest. The jury found that Nigel had knowingly placed or knowingly allowed Margaret, Allison, and Natasha to remain in conditions that endangered their physical or emotional wellbeing; that he had engaged in conduct or had knowingly placed Margaret, Allison, and Natasha with persons who engaged in conduct that endangered their physical or emotional wellbeing; that he had failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain Margaret's, Allison's, and Natasha's return; and that termination of his parental rights to Margaret, Allison, and Natasha was in their best interest. Courtney, Anjelica, and Nigel then filed these appeals.[4]

## Standard of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever

---

[4]We consolidated Courtney's and Nigel's appeals of their termination of their parental rights to Natasha with Anjelica's and Nigel's appeals of their termination of their parental rights to Margaret and Allison.

5

permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (West Supp. 2013), § 161.206(a) (West 2008); *E.N.C.*, 384 S.W.3d at 802. "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the party seeking termination must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both

6

elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573–74. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsections (D), (E), (N), or (O) of section 161.001(1) and the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(D), (E), (N), (O); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## Discussion

### I. ICWA

In Anjelica's sole issue and in Nigel's first issue in Margaret's and Allison's case, they argue that the trial court erred by failing to apply the relevant provisions of the ICWA.[5] The ICWA applies to all state child custody proceedings involving an Indian child when the court knows or has reason to know an Indian child is involved. 25 U.S.C.A. § 1912(a) (West 2013); *In re R.R., Jr.*, 294 S.W.3d 213, 217 (Tex. App.—Fort Worth 2009, no pet.). Under the

---

[5]A trial court's failure to follow the ICWA may be raised for the first time on appeal. *In re J.J.C.*, 302 S.W.3d 896, 899 (Tex. App.—Waco 2009, no pet.).

ICWA, an Indian tribe is entitled to notice of a custody proceeding involving an Indian child. *See* 25 U.S.C.A. § 1912(a). An Indian child is defined by the ICWA as an "unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." *Id.* § 1903(4) (West 2013).

The ICWA's requirements for notification and determination of Indian status apply only when "the court knows or has reason to know that an Indian child is involved." *Id.* § 1912(a) (West 2013). The question before us, then, is whether the trial court knew or had reason to know that Indian children were involved in this case. Guidelines promulgated by the Bureau of Indian Affairs[6] state,

> Circumstances under which a state court has reason to believe a child involved in a child custody proceeding is an Indian include but are not limited to the following:
>
> (i) Any party to the case . . . informs the court that the child is an Indian child.
>
> (ii) Any public or state-licensed agency involved in child protection services or family support has discovered information which suggests that the child is an Indian child.
>
> (iii) The child who is the subject of the proceeding gives the court reason to believe he or she is an Indian child.

---

[6]Although the guidelines do not have binding legislative effect, Texas courts have looked to them in aiding their interpretation of the ICWA. *See id.* at 900; *In re R.R.*, 294 S.W.3d at 217.

(iv) The residence or the domicile of the child, his or her biological parents, or the Indian custodian is known by the court to be or is shown to be a predominantly Indian community.

(v) An officer of the court involved in the proceeding has knowledge that the child may be an Indian child.

Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584 (Nov. 26, 1979).

In a progress report to the trial court filed on November 14, 2012, DFPS stated that Anjelica reported that her great-grandfather (Margaret's and Allison's great-great-grandfather) was a registered Cherokee. DFPS repeated this note again in progress reports filed on March 7, 2013, June 7, 2013, and July 2, 2013. This was information discovered by a state-licensed agency involved in child protection services that suggests that Margaret and Allison may be Indian children, and it was sufficient to trigger the ICWA's requirements for notification and determination of Indian status. *See J.J.C.*, 302 S.W.3d at 901 (holding that the trial court had reason to believe that the children were Indian because DFPS discovered that their maternal grandmother was alleged to be a member of the Chippewa Indian Nation); *R.R.*, 294 S.W.3d at 222 (holding that the trial court had reason to believe the children were Indian when mother testified that her grandmother was a registered member of the Kiowa Indian Nation). The trial court therefore erred by failing to notify the Indian tribe for an inquiry into Margaret and Allison's Indian status. *See R.R.*, 294 S.W.3d at 219 (noting that

10

the Guidelines' listed circumstances "shall trigger an inquiry by the court and petitioners").

We sustain Anjelica's sole issue and Nigel's first issue in Margaret's and Allison's case. However, a violation of the ICWA does not necessarily require reversal. *See id.* at 226–27. We may conditionally affirm the termination order, abate the appeal, and remand the case to the trial court so that the Indian tribe can be notified. *See id.* at 227. The trial court shall then conduct a hearing to determine whether Margaret and Allison are Indian children as defined by the ICWA. If, after notice and hearing, the trial court determines that the children are not Indian children, we will issue a judgment affirming the trial court's termination. *See* Tex. R. App. P. 43.2(a). If the trial court determines that the children are Indian children, then we will issue a judgment reversing the trial court's termination of Anjelica's and Nigel's parental rights to Margaret and Allison and ordering that the trial court conduct a new trial applying the ICWA. *See* Tex. R. App. P. 43.2(d).

## II. Nigel's appeals

### A. Grounds for termination

In his first three issues in Natasha's case and in his second, third, and fourth issues in Margaret's and Allison's case, Nigel challenges the sufficiency of the evidence supporting the grounds for termination. In his third issue in Natasha's case and his fourth issue in Margaret's and Allison's case, he argues that the evidence is legally and factually insufficient to support the jury's finding

11

that he failed to comply with the court-ordered provisions necessary for him to obtain his children's return. Specifically, he argues that he "substantially completed" the service plan. However, subsection (O) looks only for a parent's failure to comply with a court order, without reference to quantity of failure or degree of compliance. *See In re J.S.*, 291 S.W.3d 60, 67 (Tex. App.—Eastland 2009, no pet.). It does not provide a means of evaluating partial or substantial compliance with a plan. *Id.* Subsection (O) also does not "make a provision for excuses" for the parent's failure to comply with the family service plan. *Id.* (quoting *In re T.N.F.*, 205 S.W.3d 625, 631 (Tex. App.—Waco 2006, pet. denied)).

Among other requirements, Nigel was ordered

(1) to provide $50 per month in child support and $25 per month in medical support for Natasha and $50 per month in child support and $25 per month in medical support for Margaret and Allison;

(2) to participate in "not fewer than 5 AA/NA meetings per week";

(3) to establish and maintain safe, stable, and appropriate housing for a period of at least six months; and

(4) to establish and maintain suitable employment for a period of at least six months.

Bonnie Olsen, the CASA advocate, testified that she was never able to verify employment for Nigel and that she was concerned that he continued to live in the same house where the children were removed. Olsen said that she was concerned that Nigel was living in his mother's house because the police had informed Florence about their concerns of drugs in the home "months in

12

advance" of the raid and that Florence "did absolutely nothing to protect those three little girls from being exposed to that." Olsen also testified that she was concerned about Nigel living with his sister because of their volatile relationship.

Nigel testified that he has only worked three days since this case started. The last time Nigel held a job was two years prior to the start of this case. Olsen testified that because Nigel had not gotten a job,

> [h]e has not shown that he will be able to provide for these children without reverting back to the lifestyle he had before. Neither [Anjelica] nor [Nigel] have done the AA/NA like they should have, what they need to do in order to make these life-long commitments to a lifestyle change that would prevent them from reverting back to their former lifestyle, the lifestyle that got the girls into the situation that they're in.

Justin Claunch, a DFPS worker, testified that Nigel did not pay child support or medical support. Nigel told Claunch that he was unable to pay because "he was low on funds and did not have a job," but Claunch explained, "He was court ordered for child support, so he's ordered regardless to pay that. He would be required to find the money to pay that to help support his children while they're in foster care."

Olsen testified that Nigel did not attend all of the required AA/NA meetings. She said that by not committing to AA, "he hasn't shown that he's making that life-long commitment [to sobriety]. And by going to AA and NA, yes, it doesn't guarantee he's going to make a life-long commitment but it gives him better tools to make that life-long commitment." Nigel testified that he went to "a couple" of meetings but then "it kind of conflicted with [his] probation and [his] community

13

services and stuff [he] had to do for community service, and [his] services interfered with that too."

The evidence is sufficient to support the jury's finding that Nigel failed to comply with the court order that specifically established the actions necessary for Nigel to obtain the return of his children. Nigel did not provide child support or medical support, did not attend all of the required AA/NA meetings, did not establish suitable employment for six months, and did not establish safe, stable, and suitable housing for six months, all of which the court ordered him to do. We overrule Nigel's third issue in Natasha's case and his fourth issue in Margaret's and Allison's case. Because only one ground under section 161.001(1) is needed, we need not reach Nigel's first and second issues in Natasha's case or his second and third issues in Margaret's and Allison's case pertaining to the trial court's findings under subsections (D) and (E).[7] *See* Tex. R. App. P. 47.1; *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

## B. Due process

In his fourth issue in Natasha's case and his fifth issue in Margaret's and Allison's case, Father argues that his right to due process was violated. He argues that DFPS's policy for changing the goal of the children's cases from reunification to termination is vague and arbitrary. We have previously addressed such arguments as attacks on the sufficiency of the evidence

---

[7]Father does not challenge the jury's findings that termination of his parental rights to the three children was in the children's best interest.

14

supporting the Department's decision to change its permanency goal. *See In re V.L.A.*, No. 02-13-00147-CV, 2013 WL 5434008, at *7 (Tex. App.—Fort Worth Sept. 26, 2013, no pet.) (mem. op.).

Although the right to parent is one of constitutional dimension, DFPS is not required to show that other alternatives, short of termination, were not available to protect the children. *In re L.F.*, 617 S.W.2d 335, 340 (Tex. App.—Amarillo 1981, no writ). The ultimate decision of whether the evidence supported the Department's termination allegations rested with the jury, not the Department. *See V.L.A.*, 2013 WL 5434008 at *8 (citing *In re A.P.*, 184 S.W.3d 410, 416 (Tex. App.—Dallas 2006, no pet.)).

Justin Claunch, the DFPS caseworker, testified,

> Once a goal is changed with [DFPS], I informed [the parents] that it does not mean that it has to stay that way. If they were to show the Department and all parties that they are willing to complete their service plan and make those changes, the goal can always be changed back. I spoke to them about going to AA, finishing up their IOP program, continuing visitations, working to get a job, willing to go above and beyond for their children to show everybody that they are—that they are willing to do so and do the services for their children.

Claunch testified that the goal could have been changed from termination back to reunification if Nigel had been

> attending AA and NA and presenting—presenting that representation to me.
>
> Throughout the case I encouraged him to get a job. Throughout the case he did not get a job. He mentioned that he was not able to find one.

15

He could have taken initiative for why the children came into care and acknowledged that the drugs in the home were . . . his. Throughout the case that was never the circumstance.

[Nigel] showed up for visitations. He showed up for his—his services, and he spoke weekly to me about almost being done and almost completing what it was that was being asked but never informed CPS or CASA what he was learning or why the changes— what—based on what he was learning what changes he was making in his life.

At the time that DFPS changed its goal, Nigel would not have been able to complete the services he was ordered to complete. Specifically, Nigel would not have been able to comply with the requirement that he maintain suitable housing for six months or the requirement that he maintain suitable employment for six months. The court order establishing the services that Nigel needed to complete was signed in September 2012. Trial was held in September 2013. Nigel argues that it was impossible for him to complete the service plan because he was imprisoned until about seven months before trial. While we acknowledge that it is significantly harder to complete a service plan while incarcerated, there was ample evidence in this case demonstrating that Nigel's incarceration was the consequence of his own actions. Although Nigel maintained his innocence at trial, he acknowledged that he pleaded guilty to the offense for which he was incarcerated. At trial, Detective Fisher testified that Carrollton Police had received information from a number of different sources that Nigel was selling drugs from the home. Courtney testified that she believed Nigel was selling drugs. The cocaine found in the home was in Nigel's bedroom among

16

documents bearing his name.  Drug testing of the children showed that Margaret and Allison were positive for methamphetamines and cocaine and that Natasha was positive for cocaine.  The jury was free to disbelieve Nigel's testimony and believe that he committed the crime that resulted in his incarceration.  *See In re B.L.D.*, 113 S.W.3d 340, 348 (Tex. 2003), *cert. denied*, 541 U.S. 945 (2004).

The counselor at Sigma Counseling, Chase Chick, testified that he believed that even after counseling, Nigel remained to have high potential for drug relapse and continued legal problems.  Chick explained that Nigel's group of friends "get involved in a lot of criminal behavior."  Chick's notes from his sessions with Nigel dated July 15, 2013, state,

> [Nigel] reports his belief to be that marijuana cannot hurt anyone and [Nigel] subscribes to a variety of conspiracy theories to support his case.  [Nigel] responds that any evidence to the contrary is another conspiracy.  Thus, counseling with [Nigel] has yet to develop a positive outlook, as [Nigel] continues to subscribe to beliefs that support his desire and willingness to continue to abuse marijuana.
>
> . . . [Nigel's] insistence on the veracity of his delusions has allowed for little headway towards this cause.  Psychoeducation about the physiological effects of substance abuse have been met with similar results, as have the relationship between triggers and substance abuse behaviors.  Therefore, the current outlook for [Nigel's] prognosis is poor.

Chick testified that he did not recall Nigel ever acknowledging responsibility for his children being in DFPS's care.  Claunch testified that he did not believe that Nigel would stop smoking marijuana.  He said,

> At this point he has not taken ownership for smoking from the beginning.  He shared with me that he did not believe marijuana was a—was a hard drug.  When I explained to him that it was a drug in

17

general and he should not be smoking around his children or with the children in his presence, he shared that he would try to abide by that. But he did not believe prior to me speaking with him that marijuana was a drug.

The caseworker's and counselor's observations that Nigel's behavior had not changed since the children were removed from his care were sufficient to support the Department's decision to change the termination goal in this case. We overrule Nigel's fourth issue in Natasha's case and his fifth issue in Margaret's and Allison's case.

## III. Courtney's appeal

### A. Grounds for termination

In Courtney's first four issues, she challenges the legal and factual sufficiency of the evidence supporting the grounds for termination. In her third issue, she challenges the evidence supporting the jury's finding that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of Natasha, who has been in DFPS's temporary managing conservatorship for not less than nine months as a result of Natasha's removal for abuse or neglect. *See* Tex. Fam. Code Ann. § 161.001(1)(O) (West Supp. 2013). Courtney argues that she complied with all of the court-ordered provisions and that Natasha was not removed from her care for abuse or neglect.

18

## 1. Removal for abuse or neglect

Courtney argues that there is no evidence that she abused or neglected Natasha. However, as we have noted in previous cases, "subsection (O) does not require that the parent who failed to comply with a court order be the same person whose abuse or neglect of the child warranted the child's removal." *In re D.R.J.,* 395 S.W.3d 316, 320 (Tex. App.—Fort Worth 2013, no pet.) (citing *In re S.N.,* 287 S.W.3d 183, 188 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("Had the legislature intended such a requirement, it could have easily provided that conservatorship be 'as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child *by the parent.*'")); *see also In re D.R.A.,* 374 S.W.3d 528, 532 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (upholding termination of father's parental rights on subsection (O) grounds when child was not removed from his home or as the result of abuse or neglect allegations made against him). Contrary to Courtney's argument that Natasha was removed "based solely on 'the mother's whereabouts being unknown,'" Natasha was also removed because of Nigel's ongoing drug use, his incarceration, and his inability to care for her.

Courtney reported to the police that Nigel was selling drugs, but she continued to return Natasha to Nigel's care. Courtney told Natalie Taylor that she had heard rumors in the three months preceeding DFPS taking custody of the children that Nigel was selling and using drugs, yet Taylor testified that Courtney did not appear concerned for Natasha's safety. The police found both

19

marijuana and cocaine in Nigel's house within reaching distance of the children. After her removal, Natasha tested positive for cocaine.

There was sufficient evidence supporting the jury's finding that Natasha was removed from Nigel's care for abuse or neglect. Further, there was sufficient evidence to support a finding that Courtney knew of Natasha's abuse or neglect yet allowed her to remain in that environment. *See D.R.J.*, 395 S.W.3d at 320 (holding that evidence of mother's lack of concern about leaving her children in the home where her brother was sexually abusing other family members was sufficient to show neglectful supervision of the children by the mother supporting the jury's subsection (O) finding). We overrule this part of Courtney's third issue.

### 2. Courtney's compliance

Courtney argues both that she complied with all the requirements of her service plan and that "full compliance" with the plan was "virtually impossible." However, as we discussed above, partial or substantial compliance does not satisfy the requirements of subsection (O). *See J.S.*, 291 S.W.3d at 67.

Among other requirements, Courtney was ordered

(1) to attend and cooperate fully in weekly counselling sessions;

(2) to cooperate fully in any and all recommendations made through the counselling sessions;

(3) to attend, participate in, and successfully complete parenting classes through the Child and Family Guidance Center;

20

(4) to submit to and cooperate fully in an intake assessment through Metrocare Services;

(5) to submit to random drug testing;

(6) to complete a psychological examination and evaluation;

(7) to establish and maintain safe, stable, and appropriate housing for a period of at least six months;

(8) to establish and maintain suitable employment for at least six months;

(9) to have weekly visitation with Natasha; and

(10) to pay $50 per month in child support and $25 per month in medical support.

Courtney testified that although she was ordered to comply with the trial court's order to attend counseling by October 22, 2012, she did not go to her first session until January 2013. Courtney testified that she stopped going to counseling because she "felt like [she] was getting dumped on [during pretrial hearings]." She testified that she believed that DFPS did not like her because she "wasn't as nice as they wanted [her] to be," and that the Department "never intended on working with [her]." When Courtney attempted to re-enroll in counseling, she was not allowed. Courtney's counselor testified that Courtney did not attempt to reschedule counseling until the week before or the week of trial.

Courtney was required to do two different psychological examinations, which Claunch testified happens in cases occasionally. Claunch testified that Courtney never requested that one of the examinations be waived. Dr. Foster

recommended that Courtney attend five NA or AA meetings a week.  Olsen testified that she had concerns about the legitimacy of Courtney's AA sign-in sheets because Courtney did not turn in the sheets that DFPS had provided to her.  The DFPS sheets had a section where Courtney was supposed to fill out the subject of each meeting and get it signed.  Courtney turned in sheets that just had the dates of meetings.  Olsen testified, "The forms were obviously done in all the same pen."

Olsen testified that she had asked Courtney repeatedly for the phone number of her AA sponsor, Donna.  She explained,

> I had been after [Courtney] to give me Donna's phone number because I wanted to talk to her, and she said she couldn't do that. . . .  So then I asked her if she would please give her my phone number and have her call me.  And so when a couple of weeks had gone by and I had not heard anything, I talked to [Courtney] about I still haven't heard from her.  And she goes, well, she doesn't want to talk to CPS.  And I reminded her I'm not CPS. I'm CASA.  And she goes, well, she doesn't want to talk to CASA either.  She's had problems with you.  And so I said, well, maybe you could tell her that if she talks to me she's going to help make sure that you don't lose your daughter, that I can, you know, talk to her and find out that, yes, you are doing your AA/NA meetings.

> So right after that conversation, I wasn't even home yet from the visitation, I'm in my car and [Courtney] calls me and says, I have Donna here that will talk to you.  So then Donna got on the phone and I thanked her for talking to me and I asked her how often [Courtney] went to AA and she said two or three times a week, which kind of coincided with what [Courtney] had been telling me.  And then I asked her what step [Courtney] was on.

> . . . . [S]he told me [Courtney] was on step twelve when [Courtney] had just told me a couple of weeks prior that she was on step seven.

Claunch testified that "on several occasions," Courtney told him she was attending her services, but Claunch could not prove that she was attending because Courtney would not provide proof. Some providers also informed him that Courtney did not show for scheduled appointments. Courtney testified that after she paid her bills, she had on average about $1,300 in income a month, but she also testified that she could not start her parenting classes because she did not have the money.

DFPS requested that Courtney be drug tested in February 2013. Courtney did not appear for drug testing within the required time frame. She reported that she did not go because she did not know where the location was. DFPS requested another drug test in March 2013. Justin Claunch testified that he selected a CareNow facility that was open until 10:00 p.m. He testified that he gave Courtney the information for the location two times. Courtney failed to appear for the test. Courtney claimed that it was because she did not get off of work until 5:30pm.

Courtney was tested later in March 2013. Claunch testified that Courtney had "used at a party and she didn't think it was that big of a deal." Courtney admitted to smoking marijuana in December 2012 on New Year's Eve. She said that she was "[b]eing stupid. Just being at a party and seeing my friends smoke weed, and I hit it a couple of times knowing what the situation was." Clauch requested another drug test in May or June. Courtney never responded to Claunch's request or appeared for testing.

23

Courtney moved a number of times during the case and failed to provide DFPS with documentation or access to the home so that the Department could determine if it was suitable. Claunch testified that in the beginning of the case, Courtney told him she was living in Garland. He said,

> I went out to that home to try to visit with her to go over the service plan. After my drive out, she was not there, so I was not able to meet with her or see the home.

> In later stages of the case, I want to say around February, she informed me she signed a lease. That was again an apartment in Carrollton. The lease she provided to me about a month later was signed under another person's name, so I could not verify that that was her home. CASA and I attempted to visit in the home with her several times, and it was either canceled or she had something else that we could not meet with her because of.

> Later on in the case after she mentioned she was engaged and was going to get married, she stated that she was going to be moving in with her fiancé. I do not recall ever getting an address for where he was living at the time.

Claunch also testified, "I did not learn of her living with Henrietta until this trial. She had not shared that information with me. Likewise, she had not shared with me that she had broken up or separated from her fiancé until I heard her testimony at trial."

Courtney testified that she was let go from her employment with Knight Janitorial in November 2012 because she was "consistently needing time to either leave for court, an assessment, [or] visitation." She testified that she did not discuss her need for time off work to complete her services because she "had just started the job, and [she] was kind of afraid of being prejudged by that. [She]

24

kind of thought that was going to keep [her] from getting the employment, so [she] never mentioned it." She said she would rather appear to be an inconsistent and late employee than someone who was involved in a DFPS case. Jean Reagan, a licensed professional counselor at the Child and Family Guidance Center, testified that she did not recall Courtney ever asking for counselling appointments before or after her work hours.

Courtney produced pay stubs to DFPS to prove employment, but DFPS was concerned that they were not legitimate. The pay stubs did not have the employer's name, address, or other identifying information. The check numbers are consecutive, despite the checks being dated two weeks apart. And the amount of the year-to-date withholdings and net pay were identical for each pay period, never increasing with the new amount from that pay period. Courtney said that she could not see why the Department would find the pay stubs suspicious. Claunch testified that he asked Courtney for her employer's phone number and address so he could verify her employment. The phone number he received did not work and the address he was given was a hotel that had no knowledge of any company in the building.

Olsen also testified that she also had concerns about the legitimacy of the pay stubs and noted that they did not show that federal taxes were being withheld. Olsen testified that she was able to confirm that Courtney worked at Dynatron from the beginning of January 2012 through the end of March 2012. Courtney told Olsen that she left Dynatron and went to work for one of their

25

subsidiaries called AutoAlert. Olsen searched online for the company's information and could not find it. She testified that she got a phone number from Claunch, but no one answered the phone during the three days Olsen tried calling. Olsen then called Dynatron and Dynatron informed her that they did not have any subsidiaries.

Courtney did not attend all of her visitations with Natasha. Claunch testified,

> I discussed with [Courtney] I can recall on three different occasions about the importance of calling in so that way [Natasha] was not brought in an hour to the visit to sit there and not visit with her mother. That causes emotional disturbance with [Natasha] or with any child, and it's not in the child's best interest for that to happen. I have occasionally provided parents one mistake. If they do not call in, if they're still learning the process, that they—that they are able to still have that visit, but I speak with them about it. And in [Courtney's] case, I gave her three chances, and at the third chance, the visit that she did not confirm for was not—did not occur.

Claunch testified that visitation between Courtney and Natasha was supposed to begin with the first visit on October, 19, 2012. On October 16, 2012, Claunch had informed Courtney of the date and time of the visit, and he had given Courtney his phone number. On the day of the scheduled visit, Claunch called Courtney twice to try to confirm the visit but could not reach her. Claunch also called Henrietta to reach Courtney. Courtney did not show for the scheduled visit. Claunch tried again to contact Courtney on October 23, 2012, but Courtney did not answer and did not have her voicemail account set up so that Claunch could leave a message.

26

Courtney acknowledged that she missed two visits in February. She explained that she does not drive and had transportation problems. Courtney also acknowledged that she did not make the necessary confirmation calls for some of her scheduled visits. She testified that she was late for some visits in March and made it to only one visit in June. She also testified that a lot of her visits in July were cancelled because the foster family took Natasha "on a lot of vacations." She acknowledged that she missed all of her visitations scheduled in August.

Courtney acknowledged that she stopped paying child support. She testified,

> I'm behind on child support because when I first started paying child support and I provided the money order stubs, I was told by the assistant district attorney and the case worker that they weren't able to verify it at the Child Protective Services office. I made about maybe two, $300 worth of payments that can't be verified by [DFPS] even though they have the stubs. So when they kept saying they couldn't verify it and I kept paying, I stopped because I'm like, if you can't find my money, why do I keep paying?

> Q. Okay. So you just quit paying?

> A. Yes, I did.

The evidence shows that Courtney failed to attend all of the required counseling sessions, to complete the parenting classes, to submit to drug testing, to demonstrate that she maintained suitable housing and suitable employment for six months, to attend her visitation with Natasha, and to pay child support and medical support. This evidence was sufficient to support the jury's finding that

27

Courtney failed to comply with the trial court's order that specifically established the actions necessary for her to obtain Natasha's return. We overrule Courtney's third issue. Because only one ground under section 161.001(1) is needed, we need not reach Courtney's first, second, and fourth issues pertaining to the trial court's findings under subsections (D), (E), and (N). *See* Tex. R. App. P. 47.1; *E.M.N.*, 221 S.W.3d at 821.

## B. Best Interest

In her fifth issue, Courtney argues that the evidence is legally and factually insufficient to support the jury's finding that termination of her parental rights to Natasha was in Natasha's best interest.

### 1. Standard of review

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008).

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *C.H.*, 89 S.W.3d at 28; *see E.C.R.*, 402 S.W.3d at 249. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include:

(A) the desires of the child;

28

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *E.N.C.*, 384 S.W.3d at 807; *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors").

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## 2. The evidence

Natasha was five years old at the time of trial. *See* Tex. Fam. Code Ann. § 263.307(b)(1) (West 2008). Bonnie Olsen, the CASA advocate, testified that Natasha "is starving for attention." Olsen said that when Courtney did not show up for visitation, Natasha was disappointed. Claunch testified that Natasha was in anger management counseling.

Courtney was involved in a previous DFPS case as a parent[8] in 2009 when Natasha fell out of her crib and fractured her skull while being watched by a friend. *See id.* § 263.307(b)(2), (3). DFPS offered services to Courtney, but Courtney did not participate in any services, left Natasha in Henrietta's care, and refused to cooperate with DFPS. DFPS noted that Courtney

> ha[d] not been able to demonstrate an ability and willingness to place her child's needs before her own needs. For the duration of the FBSS stage of services, [Courtney] has been reluctant to engage in services for herself and her child. . . . [Courtney] appeared to not fully understand the seriousness of her daughter's injury.

Henrietta testified that she was entirely responsible for Natasha's care by around July 2009. She said that at that time, Courtney had "left." Henrietta had been caring for Natasha until Henrietta went out of town around May 2011. Courtney then placed Natasha with Nigel.

---

[8]Courtney was first involved with DFPS when she was a minor. In May 2005, Henrietta kicked Courtney out of the house. DFPS's notes state that Courtney had juvenile criminal history, had been a runaway, did not comply with court orders, and had "difficulty telling the truth." Henrietta told DFPS that "she thought it was the government's position to take care of [Courtney]."

There were discrepancies in testimony regarding how long Natasha had been living with Nigel and Anjelica. Natalie Taylor, a DFPS investigator, testified that Anjelica reported that Natasha had been living with her and Nigel for three years. Taylor also testified that Nigel reported that Natasha had only been living there for a year. Courtney testified that Natasha did not live with her at all in 2012, except "on weekends."

Psychologist Mark Foster conducted personality measures on Courtney. *See id.* § 263.307(b)(6). He testified, "The test data indicated that she is very likely to be quite self-centered, that she's likely to put her needs before the needs of others. She's a very high risk of substance use and continued substance use." He described her as "self-centered, having an orientation to blame others for" her own actions and explained that these were "enduring or very stable personality characteristics." He testified that substance abuse would exacerbate her tendency to express anger inappropriately and her "poor frustration tolerance."

Foster testified that based on research, he would expect parents like Courtney to be

> very immature as parents, that is, they often have expectations of the children that are unrealistic for the child's age and stage of development. . . . [T]hey'll put their needs before the needs of the child. They may be very insensitive to the effects their choices and behaviors and actions, whether it's partners, living conditions, or whatever, what effect those choices have on their children.
>
> They tend to be rather distant and uninvolved as parents. That is, we very often see that, let's say, there's a parent-teacher conference that they won't show up for, something like that. Or if they do show up for that sort of thing, they don't participate. They

31

don't participate in monitoring the children's homework or that sort of thing. We find very often that the children are not very well supervised.

Foster testified that parents like Courtney are

> going to make poor decisions in terms of parenting. The parenting choices are going to be very strongly affected by their self-centeredness. The child's needs are going to be secondary. They're going to be insensitive to the child's needs. The child is probably going to see a lot of poor frustration intolerance on the case of the parents, and . . . I would expect the child to experience a lot of anxiety from the displays of anger.

He further stated, "They're going to be unreliable. They're . . . going to be inconsistent in holding a job. They're going to be inconsistent in terms of meeting their obligations, whatever those obligations are."

> Foster's written report stated,

> The test responses provided by [Courtney] are frequently seen among persons who are at risk for assaultive behavior. She expresses her feelings of anger in a destructive manner especially when she feels that she has somehow been wronged or treated with disrespect. It would be expected that she will act on her anger with a surprising amount of determination.

The report also stated,

> [Courtney's] responses are like those of individuals who are described as immature, narcissistic, and self-indulgent. She tends to make excessive demands on others for attention and sympathy. However she is probably resentful when even the mildest demands are made on her by others. She is likely to have difficulty getting along with others in social situations.

> It is common for persons with [Courtney's] personality features to have difficulty maintaining employment. These individuals often have difficulties with fulfilling the requirements of the workplace and working cooperatively with others on continuous basis.

The romantic relationships of persons with [Courtney's] personality are characterized as having frequent conflicts. [Courtney] is probably suspicious of others and this often results in her having difficulty establishing deep emotional ties with others. Relationship instability is a frequently observed dynamic. The home life of children raised by a person with these personality characteristics is often chaotic.

Foster's report noted that Courtney's "needs may take precedence over the needs of her children at the expense of her children's wellbeing. Her romantic relationships are probably characterized as having frequent conflicts and instability. These conditions are often difficult for children and can threaten their sense of security."

Jean Reagan, Courtney's counselor, testified that Courtney "would tend to project the worst case scenario and kind of catastrophize things, which fed her anxiety which, in turn, caused her to panic and make impulsive decisions." Reagan also described Courtney as "very energetic" and "very determined" to get her services done. Reagan believed that Courtney had the ability to be a good mother.

Dr. Foster testified that Natasha was "very high risk of physical abuse, sexual abuse, neglectful supervision. The child is at risk of being emotionally abused. The child is at risk of physical neglect." *See id.* § 263.307(b)(7). Nigel has two convictions for assaulting his sister with whom he lives.

In June 2011, Courtney reported Nigel to DFPS. Because DFPS allowed Nigel to have access to Natasha, Courtney told Taylor that she believed that Natasha was safe with Nigel. Courtney testified that she continued to return

33

Natasha to Nigel after she had reported to the police that he was selling drugs and caring for Natasha while drinking alcohol because "[her] mother informed [her] that it wouldn't be smart to take her." She said, "My mother was in fear of him lashing out on me physically and on her physically."

Courtney had taken Natasha for about two weeks but had returned her to Nigel's house even though she was aware that it might be endangering. Courtney told Natalie Taylor that after her last report to DFPS, she had heard rumors that Nigel was selling and using drugs in the home. Courtney told Taylor that "back in May she heard from friends that [Nigel was] smoking and drinking while caring for the children and ha[d] also heard the past year that [Nigel was] selling marijuana and cocaine." Taylor testified that Courtney should have acted again when she heard the rumors. Taylor did not believe that if Courtney had filed another report in 2012 based on the rumors that she had heard that DFPS would not have investigated.

Courtney testified that when she did try to take Natasha, "things got physical" with Nigel. She said, "He grabbed [Natasha] out of my hands—well, he tried to grab her out of my hands. And as we struggled, he put his hand towards my neck to push me back, and I fell in the bushes." Courtney called the police, but they told her that Nigel had the right to keep Natasha. She testified that she "stopped working with the Carrollton police" after that. She also testified that she stopped trying to get DFPS to intervene because they said she was "delusional." Nigel denied that he had ever kept Natasha from Courtney.

34

Anjelica testified that she and Courtney had fights over Nigel in which they screamed and yelled and called each other names. Anjelica denied physically fighting with Courtney. Anjelica admitted that she had such a bad relationship with Courtney that she told the DFPS investigator that she did not even want to hear Courtney's name. She admitted that she had called Courtney "crazy" because Courtney had accused Nigel of choking her when he had not done so. Anjelica testified that neither she nor Nigel had any meaningful conversations with Courtney since their cases began.

Dr. Foster testified that based on Courtney's personality and the long history of contention with Anjelica it was "very unlikely" that Courtney and Anjelica had truly come to terms with each other. Courtney testified, "I don't speak with [Anjelica]. I speak directly with [Nigel]. And me and [Nigel] have been talking for a few weeks now, and we've come to the realization that us hating each other is not what our daughter—it's not what's best for our daughter."

Courtney denied using any illegal drugs in high school and stated that the only drug she had ever used was marijuana. *See id.* § 263.307(b)(8). Courtney admitted that she smoked marijuana in December 2012, while this case was ongoing.

Courtney testified that at the beginning of the case she was "very immature." *See id.* § 263.307(b)(10). Courtney testified that she learned a lot in counseling. Of her counselor she said,

35

She basically really helped me realize that I was blaming a lot of people for why this happened and I never really took my own responsibility. And it took me a while to get there, but after that, we started working on reprioritizing—putting my time in order and knowing that [Natasha] was more important. In the past I never did that, and I think that woke me up when she really helped me realize that if I was trying to put my needs before her that this is going to continue to happen, that this kind of situation is going to continue to be reflected on her life if I don't make her my main priority.

Courtney testified that she learned in counselling that she "needed to stop putting the blame on other people and to really look at what [she had] done." She admitted that she had put her education before Natasha's needs. She said, "School is going to be on the back burner until I really feel like I've given [Natasha] the full attention that she needs and feel like she's ready to be separated from me in that type of way."

Dr. Foster testified that four to six counselling sessions would not be enough to resolve Mother's issues. Based on the testing he gave Courtney, he believed there were "significant problems" with Courtney's ability to function in the work place and in her personal life. He testified that he would expect a person like Courtney to lie to others. Courtney testified that anger management classes helped her "[t]remendously." She said she learned "to keep [her] cool, to learn how to communicate better with people without getting upset or taking it personal[ly]."

Claunch described Courtney as "absent in this case for the last three months." *See id.* § 263.307(b)(11). Courtney testified that when she found out that Nigel had been released from jail, she was "pissed." She demanded that her

36

visitation be rescheduled for a different day than Nigel's visitation. She testified

that it was in Natasha's best interest because "[she did not] like [Natasha] seeing

a hostile environment between [her] and her father, and it would have been

hostile, so I was avoiding her seeing any of that." DFPS worker Claunch

testified,

> She said that she would rather not be in the same building as
> him. I emphasized to her and let her know that in the Carrollton
> office the visitation rooms—there are two visitation rooms with an
> observation room between them. At no point would [Courtney] have
> any contact with [Nigel] should—should she decide to have the
> visitation.

> And prior—in the prior visits when [Anjelica] and [Courtney]
> visited, they visited in the two separate rooms, and there were no
> issues then. They never really needed to see each other. They
> were there to visit their children. The same would have been true for
> when [Nigel] was there. But at that point [Courtney] stated that she
> is not okay with him being in the room, not being in the building, and
> she—it took about ten minutes for her to begin visitation with
> [Natasha].

> Q. And why did it take ten minutes for her to start her visit that
> day?

> A. It took ten minutes for her to calm down and me talking to
> her about the rules and should something happen between [Nigel]
> and [Natasha], which is what she feared, then CPS would be able to
> take care of it by speaking with [Nigel], calling the police if
> necessary. But typically—well, [Nigel] shared that he had no hostile
> feelings towards her. He was just there to see his children, that he
> would be okay with the visitation.

When asked why she could not arrange the visitation so that she arrived

before Nigel to avoid seeing him, Courtney responded,

> That was not the point, ma'am. The point was that when I visited my
> child, I wanted to be happy. I wanted her to see a happy mother

37

who is content, who can give her 110 percent focus on her daughter. I could not do that at that time with him because I was so angry, and I still needed to get over that anger before even being in the same room with him.

Claunch testified that the trips to the visitation location were difficult on the children because their foster home was far away. He explained that Natasha's daycare had told him that Natasha was very hyperactive and that Natasha would act up when she was not on a consistent schedule. The visits were scheduled at the Carrollton office to make it easy for the parents to get there. Claunch said,

> At that point to bring the children in, the children would be on the road for quite some time. During the first visit when I brought all three of the girls in, they were—they were awoken from a nap. They missed part of their lunch that day. So I spoke to both [Courtney] and [Anjelica] about setting up the visits biweekly on Fridays, Friday afternoons from 3:00 to 5:00, so that way it would work best with both of their work schedules and it would work for keeping the children in some sort of regular routine in the daycare and not allow for them to be on the road for a significant period of time every week.

When questioned further regarding the fact that Natasha had to be driven over two hours roundtrip twice a week because Courtney refused to have visitation on the same day as Nigel, she said,

> It was the case worker's job to bring my child to me for visitation. If it inconvenienced them, I didn't care about that. I cared about my daughter being able to visit me, see me happy, have a happy experience and not have to worry about whether or not her mom is upset that her dad is there. I don't want her to have to worry about that, so I was being selfish for my daughter, not for me.

Courtney testified that she was "very sorry" for the mistakes that she had made. She said,

I do just want to let you all know that when I had her, I was young. I was immature. I had a lot of anger in me towards her father, that sometimes she ended up getting affected by it. . . . But I know that my daughter is my main focus, and I just want you all to know that if she does come back home to me, I would never let anyone or anything ever affect her again because this is affecting her now. And I really want her to forget this ever happened to her or her sisters."

Claunch testified that Natasha had ADHD and that she had been prescribed Adderall. *See id.* § 263.307(b)(12)(B). Claunch had instructed the foster family not to give Natasha the medicine until he had spoken to everyone and obtained their approval. Claunch gave Nigel and Courtney paperwork regarding their family history of ADHD, but Nigel returned it late and Courtney did not return it at all. Clauch later discovered that the foster family had given Natasha the medication before he had approved it. When he discussed this with Courtney, only then did she tell him that she had bad experiences with Adderall, including seizures, and that she did not want Natasha on the medication.

Claunch testified that he never saw Courtney do anything to Natasha during a visit that he thought was harmful. *See id.* § 263.307(b)(12)(C). When Courtney did visit Natasha, they would color coloring books and "play make-up." Courtney testified that from the time Natasha was a year old until the time that she placed Natasha with Nigel, Natasha lived at Henrietta's home. Courtney lived elsewhere. Henrietta or her brother would care for Natasha during the week and Courtney would take her on weekends. Natalie Taylor testified that the specific dangers that Courtney posed to Natasha were

39

[c]oncerns for drug usage as well as concerns—the major concern for her protective ability, leaving—leaving [Natasha] in the care of [Nigel], [Anjelica], having concerns of drug usage, recent concerns of drug usage, not going above and beyond her protective—or her parenting obligations to ensure the safety of [Natasha], having a history CPS-wise and a history of leaving [Natasha] in other people's care so she can live about her life.

Natalie Taylor testified that Courtney did not take every effort within her parental responsibility to ensure Natasha's safety. *See id.* § 263.307(b)(12)(D). Taylor testified that it was not reasonable for Courtney to think that Natasha was safe with Nigel in September 2012 simply because the Department had closed an investigation in 2011. She testified that even if DFPS erred by not removing Natasha from Nigel's home after the first report, it did not excuse Courtney's parental duty to act when she received new information that Nigel was endangering their child.

Courtney testified that her mother was "[v]ery committed" to helping her raise Natasha and that she believed it was in Natasha's best interest to be returned to her. *See id.* § 263.307(b)(13). Claunch testified that although he told Henrietta that she could visit Natasha during Courtney's visitation, Henrietta only attended one visitation. Henrietta also has a history with DFPS because Courtney previously had been removed from her care when Courtney was seventeen years old. At that time, Henrietta "was unable to care for [Courtney] due to [Courtney's] behavior, running away, aggression, and that she could no longer care for her." Taylor testified that she spoke with Courtney's family members during her investigation, and "[t]here were concerns noted by the

40

family" regarding Courtney's ability to care for Natasha. Taylor also had concerns about Henrietta's ability to protect and care for Natasha.

Henrietta testified that she would be protective of Natasha and that she did not think it was in Natasha's best interest to have Courtney's parental rights terminated. Henrietta admitted that Courtney had not exemplified a good parent to Natasha in the past. But she testified that she has seen changes in Courtney and that Courtney is ready to take care of Natasha. Taylor's notes from her conversations with Henrietta in September 2012 noted that "[Henrietta] stated that she believes the children are better off in Foster Care than placed with [Courtney]," and that "[Henrietta] stated that [Courtney] has not been able to care for [Natasha] for many years." In October 2012, Henrietta stated that "she believes [Courtney] could be a good care provider for [Natasha] if [Courtney] was monitored closely."

Anjelica testified that she thought Courtney was a decent mom and would take good care of Natasha. She believed that Courtney could provide a safe environment for her daughter. She testified that in her opinion, Courtney's rights to Natasha should not be terminated. Courtney testified that at the time Natasha was removed, she was not getting along with Nigel and that Nigel did not have her phone number or address. Nigel testified that he would want Natasha to be with Courtney rather than in foster care, and he believed that Courtney can care for Natasha. Courtney testified that she never sought child support from Nigel.

41

Although she filed a case with the Office of the Attorney General for child support, after Nigel took a DNA test, Courtney chose not to pursue child support.

Courtney worried that if her parental rights to Natasha were terminated, Natasha would

> grow up feeling as if no one fought for her, that she was just taken, that her parents didn't care. I don't expect the family that's adopting her to sit her down and explain what all happened if she is taken from me. I don't see that. So I see her growing up feeling as if, yeah, I have my sisters, yeah, I have my brother who I just met, but where's my mom? She will always be questioning that.

Courtney testified that in January 2010, she was arrested for prostitution. She denied that she had been prostituting, but she had pleaded guilty to the charge. She testified that she had gone to a woman's apartment that she had met through her work at Bluefish Ministries who was prostituting, and an undercover police officer offered her a ride. Courtney testified that he asked her if she was a prostitutiute and she "started laughing with him and . . . got smart and [she said] like, yeah, sure, I do." Courtney testified that Natasha was three years old at the time, but that Courtney was not thinking of her or Natasha's safety when she got into the stranger's car.

Courtney's future plans for Natasha included building the relationship between Courtney and her mother and enrolling Natasha in the elementary school near her house. If Natasha was not ready for kindergarten, Courtney planned to enroll her at KinderCare. Courtney said that if returned to her, Natasha would not end up back in DFPS's care because "for one [she does not]

42

ever plan on letting it ever get as far as it did this time. Secondly, the anger management has really helped [her], severely helped [her]." Courtney testified, "My plans are to begin working. Whenever I can get the time, I'll—definitely going to be going back to school, hopefully online so I don't have to continue to juggle with going to school and going to work and having no transportation."

Claunch testified that DFPS planned for Natasha's current foster home to adopt her and her sisters. He said that the foster family "made [it] evident many times" that they wanted to adopt the children. The foster parents enrolled Natasha in a bridge school, which is a school for children who "aren't quite ready for kindergarten."

Natasha was moved twice into different foster homes. The first foster home decided that it was not able to care for all three children. The second foster home inappropriately contacted the parents, and the children were removed by request of the parents. The children were finally placed with the family that had adopted Anjelica's and Nigel's child, Johnny. Claunch explained,

> The CPS's goal in any case is to move the children the least amount of times as possible. Every time you move a child, there are consequences that come with that. It affects the child emotionally. It affects the child's ability to develop. A lot of times the children will be hurt. In no case is a child moved without proper approval and lots of people's approval going through with that. CPS does not want to move the children from one foster home to the next foster home not knowing that that next foster home is not going to be a permanent option should the parents' rights be terminated or restricted.

> The home that they were in, the foster parent two's home shared that they are—they were more than willing to adopt. They

43

wanted the girls there. That's where—you know, they—they loved the girls and that's where they wanted them throughout this case, so that was a permanent option should termination be sought and—and—and obtained. When their behavior started becoming erratic and we were not able to control and there were concerns about the home, CPS took the—I and my supervisor and other people with the Department, we took the initiative to follow-up with a home study with [Johnny's] home and—and do all of the process to get approval for the children to be placed into that home because we knew that that would be potentially another long-term and permanent placement for the girls should termination be sought.

Claunch testified that he tried several times to notify Courtney of the move, but she did not return his phone calls and he could not leave voicemail messages for her.

Claunch said he had no concerns about the foster family's commitment to the children. He testified,

I believe wholeheartedly that they wish to adopt these girls. They pursued communication with me throughout the case to take tasks along the way that would allow for adoption to take place. And since [placement] they have maintained solid contact with me in informing me how the children are doing.

Olsen testified that Natasha was doing "very, very well" and was happy in her foster home. Olsen said that since moving into the new foster home, Natasha "has the brighter smile. She has a twinkle in her eyes. And what I really noticed was her manners, and I even commented on how proud I was on the—what good manners she is using." Olsen testified that she interacted well with her biological half-brother, Johnny, and the biological children of her foster parents. Olsen testified that the foster parents plan to adopt Natasha and that based on her observations, she had no concerns that they would not adopt

44

Natasha. Olsen believed that the current foster home "would be a very good forever home" for Natasha.

The foster mother testified that she is a stay-at-home mom and that the household's income can adequately provide for all of the children. She testified that Natasha has "made huge strides" in the month before trial and that she and her husband "have been very intentional about reminding her that she is safe, that she is loved, that she is wanted." She testified that they are "[a]bsolutely" committed to adopting the children. Claunch testified, "If for whatever reason that foster family chose not to adopt, CPS would search out another adoptive home that would keep all three of the girls together."

Claunch testified that he believed termination of Courtney's parental rights to Natasha was in Natasha's best interest because

> [Courtney], you know, throughout the case has provided information that has come across questionable. Although she was not involved with the removal, she was—she was responsible for the placement of [Natasha] into the care of the other two parents. She—she hasn't taken responsibility for that throughout the case. She felt as though CPS should not be—CPS should not be involved with her. She has attempted to cover up—I feel as though the evidence has shown that she has attempted to cover up some of the services that she's tried so far.

Claunch did not believe that Courtney had shown a commitment to Natasha in the twelve months prior to trial.

Olsen also testified that she believed it was in Natasha's best interest for Courtney's rights to be terminated. She said,

45

[Courtney] abandoned [Natasha]. She abandoned her and left her with [Nigel] even though she knew that [Nigel] had already lost a child in a CPS case. I feel that was endangerment. [Courtney] has not taken her visitations with [Natasha] seriously. She has scheduled visitations and not shown up. We've brought [Natasha] in for a visitation and she's not shown up, and I have had to take her back home. She went five weeks from July until when the girls were moved without scheduling a visitation. That to me is again abandonment.

Olsen testified that she was

worried about [Courtney] abandoning [Natasha] when it doesn't fit her lifestyle again. [Courtney] told us that she doesn't want to put her life on hold waiting to see what happens with [Natasha]. She— you know, she's gotten engaged. She moved in with the—with the guy she plans on marrying, who I understand also has a criminal record, so whether that would be a suitable home for [Natasha], I don't think so. CASA doesn't think so. I'm sorry.

### 3. Sufficiency

Considering Mother's unwillingness to put her daughter's needs before her own and effect positive changes within a reasonable time, her failure to cooperate with and facilitate the Department's supervision because she felt she was put upon, and the other relevant statutory and *Holley* factors, we hold that, in light of the entire record, and giving due consideration to evidence that the jury could have reasonably found to be clear and convincing, the jury could reasonably have formed a firm belief or conviction that termination of Courtney's parental rights to Natasha was in Natasha's best interest. *See In re T.M.J.*, 315 S.W.3d 271, 278–79 (Tex. App.—Beaumont 2010, no pet.) (holding the evidence legally and factually sufficient to support finding that termination was in the best interest of the children when, among other things, mother failed to complete her

46

service plan, and her counselor believed that mother expressed little concern about the children, lacked interest in them, and lacked motivation to help herself or the children); *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) (holding that evidence of a parent's failure to comply with her family service plan supports a finding that termination is in the best interest of the child). Accordingly, the evidence is legally and factually sufficient to support the jury's family code section 161.001(2) best interest finding. We overrule Courtney's fifth issue.

## Conclusion

Having sustained Anjelica's issue and Nigel's first issue in Margaret's and Allison's case, we abate the appeal in No. 02-13-00346-CV and remand the case to the trial court so that it may properly notify the necessary Indian tribe and so that, after such notice, it may conduct a hearing and make a determination as to whether Margaret and Allison are Indian children under the ICWA. If after notice and hearing the trial court determines that Margaret and Allison are not Indian children, then the termination judgment of the trial court in cause No. 02-13-00346-CV is affirmed. If after notice and hearing the trial court determines that Margaret and Allison are Indian children, then the termination judgment of the trial court is reversed, and the trial court shall conduct a new trial applying the ICWA.

Having overruled Nigel's issues in Natasha's case and all of Courtney's issues, we affirm the trial court's order in the appeal No. 02-13-00345-CV terminating Courtney's and Nigel's parental rights to Natasha.

/s/ Lee Gabriel
LEE GABRIEL
JUSTICE

PANEL:  MCCOY, MEIER, and GABRIEL, JJ.

DELIVERED:  February 28, 2014